**DISTRICT OF COLUMBIA, et al.,**
Appellants/Cross–Appellees,

v.

**EASTERN TRANS–WASTE OF MA-
RYLAND, INC., et al., Appel-
lees/Cross–Appellants.**

Nos. 96–CV–1690, 96–CV–1760, 96–
CV–1907 and 97–CV–627.

District of Columbia Court of Appeals.

Argued June 10, 1999.
Decided Aug. 10, 2000.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corporation Counsel, Appellate Division, and Martin B. White, Assistant Corporation Counsel at the time the brief was filed, were on the brief, for appellant in Nos. 96–CV–1690, 96–CV–1760 & 97–CV–627, and for appellee in No. 96–CV–1907.

A.J. Cooper and Herman Schwartz, with whom Camilla C. McKinney and D. Michael Lyles, Washington, DC, were on the brief, for appellee in Nos. 96–CV–1690, 96–

1760 & 97–CV–627, and for appellants in No. 96–CV–1907.

Andrew D. Levy, C. Christopher Brown, and Joseph B. Espo, Baltimore, MD, filed an amicus curiae brief for USA Waste of D.C., Inc.

Before STEADMAN and REID, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

The interlocutory appeals in these consolidated cases[1] raise discrete issues relating to complaints pending in the Superior Court of the District of Columbia. The complaints seek declaratory, injunctive and other relief concerning the application and enforcement of the District of Columbia Solid Waste Facility Permit Act, D.C.Code § 6–3401 et seq. (1995 and March 2000 Supp.), and the District of Columbia Illegal Dumping Enforcement Act, § 6–2911 et seq. Appellees and cross-appellants, Eastern Trans–Waste of Maryland, Inc. and the company's individual owners ("ETW"), filed lawsuits against appellants and cross-appellees, the District of Columbia and certain of its agencies ("the District"), af-ter the District took action against ETW for alleged illegal disposal of solid waste.

The District challenges the September 27, 1996, Memorandum and Order of the Honorable Stephen F. Eilperin, determining on summary judgment, that: (1) an order enjoining the District from enforcing the temporary version of the Solid Waste Facility Permit Act should be modified[2] to apply to the permanent version of the law "and its accompanying regulations";[3] and (2) the $4.00 per ton solid waste facility charge, set forth in § 6–3457(b)(1) and imposed on persons operating solid waste facilities, is an unconstitutional burden on interstate commerce in so far as it affects waste originating outside the District. On appeal, the District maintains that: (1) the trial court erred by modifying and extending the July 7, 1995 temporary restraining order since ETW failed to show that it is entitled to preliminary injunctive relief; (2) under the District's anti-injunction statute, D.C.Code § 47–3307 (1997), which prohibits lawsuits to enjoin the assessment or collection of taxes, neither the trial court nor this court has jurisdiction to consider the constitutionality of the $4.00 per ton solid waste facility charge, or the

1. Nos. 96–CV–1690 and 96–CV–1907 concern the trial court's civil action No. CA6973–94. In that case, appellees Eastern Trans–Waste of Maryland, Inc. and its individual owners filed a verified complaint on June 21, 1994 against the District of Columbia and its Department of Public Works ("DPW"), Metropolitan Police Department ("MPD"), and Department of Consumer and Regulatory Affairs ("DCRA"). No. 96–CV–1690 is the District of Columbia's appeal, and No. 96–CV–1907 is the appeal of Eastern Trans–Waste of Maryland, Inc. In No. 96–CV–1760, which pertains to the trial court's civil action No. CA5312–95, Eastern Trans–Waste of Maryland, Inc. filed a second action on July 15, 1995 against the District, DPW, MPD, and DCRA. The first action, in part, challenged emergency recycling and illegal dumping legislation enacted by the Council of the District of Columbia. The second lawsuit, in part, attacked temporary solid waste facility permit legislation passed by the Council. On October 25, 1994, Eastern Trans–Waste of Maryland, Inc. amended its first complaint. In No. 97–CV–627, which relates to the trial court's civil action No. CA7944–94, Goode Trash Removal, Inc. and its owner filed suit on July 15, 1994 against the District, DPW, MPD, and DCRA. Counsel for ETW has advised the court that Goode Trash Removal, Inc. and its owner assigned their interests to ETW. The trial court consolidated all of the lawsuits because they included somewhat similar or related counts. The appeals also were consolidated.

2. In an order dated July 7, 1995, the Honorable Zinora M. Mitchell–Rankin granted ETW's motion for a temporary restraining order and enjoined the District from enforcing the temporary version of the Solid Waste Permit Facility Act and its emergency and proposed rules, 21 DCMR §§ 730 and 731 (June 2, 1995).

3. The District also challenges the trial court's summary judgment order to the extent that the reference to the Solid Waste Facility Permit Act's "accompanying regulations" precludes it from enforcing its zoning laws.

collection fee mandated by § 6–3415(b), because they are taxes that ETW must pay before it may bring suit against the District; (3) the solid waste facility charge does not violate the commerce clause; and (4) the trial court erred in enjoining the District from enforcing its zoning laws against ETW. ETW contends that the trial court erred in failing to rule that the recycling surcharge and collection fee mandated by § 6–3415(a) and (b) are unconstitutional.[4] Amicus, USA Waste of D.C., Inc., (1) challenges the District's solid waste "tax scheme," and (2) argues that the solid waste facility charge violates the due process and equal protection clauses of the Constitution of the United States.[5] A threshold question also exists as to whether this court has jurisdiction to entertain these interlocutory appeals.

We conclude that: (1) this court has jurisdiction to entertain the interlocutory appeals relating to the injunction and the solid waste facility charge; (2) on the peculiar circumstances of this case, § 47–3307 does not bar this court from considering the constitutionality of the solid waste facility charge, which we deem to be a tax rather than a fee under applicable case law; (3) the trial court did not abuse

its discretion in modifying and extending the July 7, 1995 temporary restraining order; and (4) nothing in the trial court's July 7, 1995, or September 27, 1996, orders precludes the District from enforcing its zoning laws. Furthermore, we are constrained to remand the trial court's judgment regarding the solid waste facility charge for further proceedings consistent with this opinion. Finally, we agree with the trial court that additional factual development is essential to the resolution of issues regarding the collection fee and the recycling surcharge, and thus, do not determine whether we have jurisdiction over ETW's appeal; nor do we reach the merits of the issues presented by ETW's interlocutory appeal. Accordingly, we affirm the trial court's judgment in part, and remand this case to the trial court for further proceedings consistent with this opinion.

### FACTUAL SUMMARY

In late 1993, the Council of the District of Columbia began to consider and enact legislation,[6] and the executive branch of the District government promulgated regulations, designed to address problems created by waste collection businesses that

---

4. In addition, ETW argues that the Federal Aviation Administration Authorization Act, 49 U.S.C. § 11501(c) preempts § 6–3451 and "annuls" the $4.00 per ton solid waste facility charge, § 6–3457(b)(1), and also preempts § 6–2912(a) which, among other things, prohibits the unauthorized disposal of solid waste. These arguments were not raised or considered in the trial court and we decline to consider them on appeal. *See Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

5. Specifically, amicus asserts that: "The solid waste facility charge produces an irrational classification between residents of single family dwellings and those of multi-family apartment buildings and thereby violates the constitutional guaranties of due process and equal protection of the laws." We are unable to find anything in the record before us indicating that this argument was raised in the trial court. Therefore, we decline to consider it on appeal. *See Miller v. Avirom*, note 4, *infra*.

6. Some of the legislation considered and enacted included: (1) "Illegal Dumping Enforcement Amendment Act of 1994" (D.C. Law 10–117, January 25, 1994, 41 DCR 3190); (2) "Recycling Fee and Illegal Dumping Emergency Amendment Act of 1994" (D.C. Act 10–269, July 7, 1994, 41 DCR 4669); (3) "Solid Waste Facility Permit Emergency Act of 1994" (D.C. Act 10–384, December 28, 1994, 42 DCR 45); (4) "Solid Waste Facility Permit Temporary Act of 1994" (D.C. Act 10–398, January 18, 1995, 42 DCR 520) (D.C. Law 10–251, January 18, 1995, 42 DCR 1650); (5) "Recycling Fee & Illegal Dumping Enforcement Act of 1995" (D.C. Law 11–12, March 6, 1995, 42 DCR 2539); (6) "Solid Waste Facility Permit Act of 1995" (D.C. Law 11–94, December 18, 1995, 43 DCR 1320); (7) "Solid Waste Facility Permit Amendment Act of 1998" (D.C. Law 12–286, June 4, 1999, 46 DCR 5478).

had no permit or license to operate waste transfer stations in the District.[7] The record on appeal shows that on June 7, 1994, DPW sent a notice to all solid waste and recycling haulers, including ETW, advising them that under the Illegal Dumping Enforcement Act of 1994, "it is illegal for any person to cause or permit any solid waste transported in a vehicle to be disposed in or upon any area unless the site is authorized by the Mayor." On June 14 and 15, 1994, the District took action against ETW, a family owned business that collects solid waste mainly from federal facilities in the District of Columbia, Maryland and Virginia, separates recyclables, and transfers the waste residue to the I–95 Resource Recovery Facility in Lorton, Virginia ("Lorton landfill").[8] The District seized an ETW truck and carried out inspections of ETW's facility, located at 1315 First Street, S.W.

Reacting to the District's efforts to require businesses, such as ETW, to obtain a permit for their solid waste activities, and to pay certain charges and fees, including a solid waste facility charge and a collection fee, ETW filed lawsuits in 1994 and 1995, seeking to enjoin enforcement of the Illegal Dumping Enforcement Act and the Solid Waste Facility Permit Act, as well as their implementing regulations. Further, among other relief, ETW eventually sought an order declaring that the then existing versions of the Acts, as well as any future versions of the Acts were unconstitutional, as applied, under the commerce clause of the Constitution of the United States. On July 7, 1995, the trial court granted ETW's motion for a temporary restraining order, which was modified and extended on September 27, 1996; the September 27 order also partially granted ETW's motion for summary judgment by

7. The Council committee report accompanying permanent solid waste facility permit legislation explained the history of the Council's legislative actions in the solid waste area as follows:

> In 1994, a number of solid waste handling facilities, commonly known as transfer stations, opened for business in the District, without informing the community, after each obtained a certificate of occupancy from the Department of Consumer and Regulatory Affairs, which did not specify their trash transfer activity. These facilities did not ever apply for a certificate of occupancy listing their actual activity, so the District government was unaware of their intended activity. Soon thereafter, the Committee began receiving numerous complaints from adjoining residents and businesses. The primary complaints centered on bad odors, increased rats and increased trash truck activity on residential streets.

Council of the District of Columbia, Committee on Public Works and the Environment, REPORT ON BILL 11–36, THE "SOLID WASTE FACILITY PERMIT ACT OF 1995," September 20, 1995, at 2. The Council committee report relating to the Solid Waste Facility Permit Amendment Act of 1998 further explained the need for the solid waste legislation:

> Ten years ago there were no private solid waste facilities operating in the District of Columbia. All residential and commercial solid waste collected in the District was disposed of at either the Lorton landfill or

> incinerated by the District at its facility. Approximately 8 years ago, due to significant market changes in the solid waste industry, as many as 10 solid waste facilities opened in the District. There was no existing regulation of these operations when they first opened. . . .
>
> It has come to the Council's attention that, from the opening of these solid waste facilities to the present time, businesses and residents have suffered severe adverse impact to public health and safety as a result of these operations, including but not limited to noxious odors and poor air quality, increased rodents and other disease carriers, additional debris on streets and dust in the air, additional waste entering the sewer and water systems, increased traffic noise, roadbed erosion from additional heavy truck traffic, and exposure to children on their way to school to heavy, fast moving trucks on streets where previously no such traffic had existed . . .

Council of the District of Columbia, Committee on Public Works and the Environment, REPORT ON BILL 12–582, The "SOLID WASTE FACILITY PERMIT ACT OF 1998," November 4, 1998, at 2.

8. The Lorton landfill, which has been operated by the District, was scheduled to close in 1995. A second disposal facility in the area, the Fairfax County incinerator, is controlled by Fairfax County.

determining that the $4.00 solid waste facility charge imposed by § 6–3457(b)(1) is unconstitutional "as applied to solid waste processed in the District for less than 24 hours which originates and is destined for disposal out of the District. . . ." However, the trial court concluded that other issues relating to the Acts, including whether the $4.00 per ton solid waste facility charge was unconstitutional as applied to waste originating in the District, raised factual questions, and thus, were not ripe for decision. Both the District and ETW noticed appeals.

## ANALYSIS

*The Jurisdictional Issues*

### The Interlocutory Order

Since these cases are still pending in the trial court, we first determine whether this court has jurisdiction to resolve the issues raised by the District which relate to the trial court's September 27, 1996 memorandum and order: (1) the modification and extension of the July 7, 1995 temporary restraining order; and (2) the partial resolution of the $4.00 per ton solid waste facility charge. The September 27 ruling of the trial court is an interlocutory order, and generally, this court's jurisdiction is limited to reviewing " 'final orders and judgments of the Superior Court of the

District of Columbia.' " *Dyer v. William S. Bergman & Associates, Inc.*, 635 A.2d 1285, 1286–87 (D.C.1993) (quoting D.C.Code § 11–721(a)(1) (1989)). One exception to this general rule is the certification of a question of law to this court by the trial judge, pursuant to § 11–721(d) and Super. Ct. Civ. R. 54(b), before the entire case has been adjudicated.[9] Although the record shows that ETW filed motions on November 15, 1996 and December 20, 1996, "request[ing] permission to file appeal pursuant to D.C.Code [§] 11–721(d)," counsel for ETW advises that permission was denied. The District did not file a Rule 54(b) motion.

Another route to this court, without a final judgment or a Rule 54(b) certification or appeal under § 11–721(d), is an appeal of an order pertaining to an injunction. "Under D.C.Code § 11–721 [ (a) (1995) ], this court has jurisdiction of appeals . . ., in limited circumstances, from certain interlocutory orders. . . ." *Hagner Management Corp. v. Lawson*, 534 A.2d 343, 344 (D.C.1987).[10] If the interlocutory order concerns an injunction; or "has 'the practical effect' of granting or refusing an injunction," and "imposes 'a sufficiently serious injury to justify an immediate appeal,' " the order is appealable. *Id.* at 345 (citing *Brandon v. Hines*, 439 A.2d 496,

9. Section 11–721(d) provides in pertinent part:

When a judge of the Superior Court of the District of Columbia in making in a civil case . . . a ruling or order not otherwise appealable under this section, shall be of the opinion that the ruling or order involves a controlling question of law as to which there is a substantial ground for a difference of opinion and that an immediate appeal from the ruling or order may materially advance the ultimate termination of the litigation or case, the judge shall so state in writing in the ruling or order. The District of Columbia Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from that ruling or order, if application is made to it within ten days after the issuance or entry of the ruling or order. . . .

Super. Ct. Civ. R. 54(b) specifies in relevant part:

When more than 1 claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or 3rd-party claim, or when multiple parties are involved, the Court may direct the entry of a final judgment as to 1 or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

10. Section 11–721(a)(2) provides in pertinent part:

(a) The District of Columbia Court of Appeals has jurisdiction of appeals from—. . . .

(2) interlocutory orders of the Superior Court of the District of Columbia—

(A) granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions. . . .

506–07 (D.C.1981)) ("adopt[ing] a two-part test established by the Supreme Court in *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), for deciding the appealability of orders under the corresponding federal statute governing interlocutory appeals, 28 U.S.C. § 1292(a)(1) (1976)") (footnote omitted).

 It is clear that the portion of the trial court's September 27, 1995 order which modifies and extends the July 7, 1995 temporary restraining order constitutes a preliminary injunction, and we have jurisdiction to review the modification and extension of that order.[11] *See Simmons v. Block,* 782 F.2d 1545, 1549 (11th Cir.1986) (construing the federal counterparts to § 11–721(a)—28 U.S.C. § 1292(a), and Super. Ct. Civ. R. 54(b)—Fed.R.Civ.P. 54(b); and concluding that "the order appealed from is clearly an injunction," and that: "The appealability of an injunction under 28 U.S.C. is not affected by Fed. R.Civ.P. 54(b)"). A question arises, however, as to whether that part of the September 27, 1995 order which grants summary judgment in favor of ETW as to the $4.00 per ton solid waste facility charge, as applied to waste originating outside the District, is appealable by the District. In a footnote in *Barry v. Little,* 669 A.2d 115 (D.C.1995), we stated that:

> An order granting partial summary judgment is usually considered a non-

appealable interlocutory order in the absence of a certification under Super. Ct. Civ. R. 54(b). *Cohen v. Owens & Co.,* 464 A.2d 904 (D.C.1983). However, because injunctive relief was granted pursuant to [the] judgment [in this case], this appeal is properly before us pursuant to D.C.Code § 11–721(a)(2)(A) (1995 Repl.).

*Id.* at 117 n. 5 (citing *Gomez v. Turner,* 217 U.S.App.D.C. 281, 285, n. 5, 672 F.2d 134, 138, n. 5 (1982)); *Roth v. Board of Regents,* 446 F.2d 806, 807 (7th Cir.1971), (rev'd on other grounds, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Ortiz v. Eichler,* 794 F.2d 889, 891 (3rd Cir.1986)).[12] *See also Brown v. Kerr–McGee Chem. Corp.,* 767 F.2d 1234, 1237 (7th Cir.1985) (order granting partial summary judgment on one count of complaint held appealable under "28 U.S.C. § 1292(a)(1) because the summary judgment had the practical effect of denying plaintiffs' request for permanent injunctive relief"). Given these authorities, we conclude that we also have jurisdiction to hear the District's appeal from that part of the interlocutory order which grants partial summary judgment to ETW with respect to the $4.00 per ton solid waste facility charge. However, this conclusion may be affected if we determine that the solid waste facility charge constitutes a tax, an issue which we discuss later in this opinion.[13]

---

11. At the September 13, 1996 hearing before Judge Eilperin on ETW's motion for summary judgment and modification and extension of the July 7, 1995 temporary restraining order, counsel for ETW argued that ETW was entitled to a permanent injunction.

12. *Gomez, Roth* and *Ortiz, supra,* all pertained to orders involving the grant of partial summary judgment. The court in *Gomez* stated that: "Because the subject order granted an injunction ..., this appeal is properly before us pursuant to 28 U.S.C. § 1292(a)(1) (1976)." 217 U.S.App.D.C. at 285 n. 5, 672 F.2d at 138 n. 5. Similarly, in *Roth,* the court concluded that the interlocutory order "amounted to an injunction and was appealable as such under 28 U.S.C. § 1292(a)(1)." 446 F.2d at 807. The court in *Ortiz* determined that it had jurisdiction under § 1292(a)

"[b]ecause the district court's order granted some of claimant's requests for injunctive relief. ... [Furthermore,] [w]here the additional elements of the district court's order are closely intertwined with those granting or denying injunctive relief, the exercise of jurisdiction over the additional elements is proper." 794 F.2d at 892 (citations omitted).

13. If the solid waste facility charge is a tax, jurisdiction might be precluded under D.C.Code § 47–3307 (1997) which reads: "No suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." Under § 47–3307, a person must first pay the tax before challenging it, except in "extraordinary circumstances." *See District of Columbia v. United Jewish Appeal*

In its cross-appeal, ETW challenges the trial court's denial of ETW's motion for summary judgment with respect to sections of the Recycling Fee and Illegal Dumping Emergency Amendment Act of 1994 [14] which impose a recycling surcharge and a collection fee, § 6–3415(a) and § 6–3415(b).[15] The trial court appeared to conclude that the applicability of these code sections to ETW might depend upon the outcome of a factual hearing. As the court stated:

> While the court thinks that ETW has the better of the argument that the regulatory scheme unconstitutionally forces the interstate commerce hauler to pay a double fee—namely, the D.C. collection fee and any surcharge imposed by the State in which it ultimately dumps—the court is of the view that a fuller factual record would help explicate the regulatory scheme so the court could be surer of its views.

We need not address the issues raised by ETW's appeal, that is, the recycling surcharge and the collection fee, because, even assuming, without deciding, that we have jurisdiction over these matters, we agree with Judge Eilperin that further factual development is essential to a determination of the constitutionality of the collection fee and recycling surcharge.

**Applicability of the District's Anti–Injunction Act, D.C.Code § 47–3307**

We now consider whether we have jurisdiction under D.C.Code § 47–3307 to

*Fed'n of Greater Washington, Inc.,* 672 A.2d 1075, 1079 (D.C.1996); *Barry v. American Tel. & Tel. Co.,* 563 A.2d 1069, 1073 (D.C.1989).

14. The permanent legislation, the "Recycling Fee & Illegal Dumping Enforcement Act of 1995," D.C. Law 11–12, became law on May 9, 1995.

15. Section 6–3415(a) provides:
(1) The Mayor shall impose a recycling surcharge on all persons who dispose of solid waste through the solid waste disposal system of the District to offset the cost of developing new and additional methods of solid waste management.

reach the merits concerning the $4.00 solid waste facility charge. Section 47–3307 provides: "No suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." In *Barry, supra,* 563 A.2d at 1074, "we h[e]ld that section 47–3307 applies with equal force to bar suits for injunctive and declaratory relief before payment of the challenged assessment." Thus, if the solid waste facility charge constitutes a tax, and ETW has not paid the tax, we may assert jurisdiction and:

> equitable relief may be obtained against the collection of [the] tax [only if the following requirements are met]: 1) a finding that "under no circumstances could the Government ultimately prevail," and 2) that "equity jurisdiction otherwise exists," that is, proof of irreparable injury and inadequacy of the legal remedy.

*Id.* at 1075 (quoting *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 6–7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962)) (other citations omitted).

To determine whether the solid waste facility charge is a tax, we first examine the relevant statutory provisions; then we apply legal principles governing the distinction between a fee and a tax. Under D.C.Code § 6–3457(a), the solid waste facility charge is imposed "for operating a solid waste facility in the District." Section 6–3457(a) provides:

> (2) The Mayor shall provide a credit to apply to the recycling surcharge imposed by this subsection for persons who pay the fee imposed by subsection (b) of this section which credit shall be equivalent to the recycling surcharge imposed by this subsection.

Section 6–3415 (b) states:
> The Mayor shall impose a collection fee, for the privilege of collecting solid waste as a commercial activity, on all persons licensed to collect solid waste in the District. The collection fee shall be equivalent to the recycling surcharge authorized in subsection (a) of this section.

In addition to the solid waste facility application fee for a permit, a person shall pay a solid waste facility charge for operating a solid waste facility in the District. The solid waste facility charge shall be based upon the actual tonnage of solid waste deposited at the solid waste facility, as indicated in the periodic report.

Monies received from the payment of the charge are used for recycling activities in the District, the "develop[ment] of new and additional methods of solid waste management," and for the enforcement of the Solid Waste Permit Act. As sections 6–3457(d) and (f) specify:

> (d) The Mayor may revise the solid waste facility charge as necessary to offset the cost of developing new and additional methods of solid waste management and to fund recycling activities of the District to enforce the provisions of this subchapter.

> (f) Subject to the enactment of appropriations, revenues collected from the payment of the solid waste facility charge shall be used to fund recycling activities in accordance with § 6–3415.[16] Not more than 20% of the solid waste facility charge shall be made available to the agency responsible for the enforcement of the requirements of this subchapter.

The District urges us to conclude that the solid waste facility charge is a tax and that because § 47–3307 is jurisdictional, this court has no jurisdiction to decide the issue relating to that charge.[17] In its reply brief, ETW contends that the solid waste facility charge is a fee rather than a tax,[18] and that since the District did not raise the question of the applicability of § 47–3307 until its reply brief, filed in this court, it should be deemed to have waived the right to invoke the statute. Before considering whether the District has waived the anti-injunction statute, we must ascertain whether the solid waste facility charge is a tax or a fee.

■ "To determine whether a particular charge is a 'fee' or a 'tax,' the general inquiry is to assess whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'" *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir.2000) (citing *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir.1997)); *see also Cumberland Farms, Inc. v. Tax Assessor, State of Maine*, 116 F.3d 943, 946–47 (1st Cir.1997). This general inquiry leads to an ambiguous result with respect to the solid waste facility charge because the Solid Waste Facility Permit Act and its legislative history suggest that the charge is designed both to raise revenue and to regulate the solid

**16.** Section 6–3415 concerns the recycling surcharge and the collection fee. Section 6–3415(f) states:

> Money generated from the recycling surcharge and collection fee required by this section shall be used to fund recycling activities in the District, no more than 25% of which shall go to fund the recycling educational and promotional activities of the Environmental Planning Commission.

**17.** The District also contends that the Civil Division of the Superior Court has no authority to invalidate tax laws under D.C.Code § 11–1201(1) (1995) which provides that: "The Tax Division of the Superior Court shall be assigned exclusive jurisdiction of—(1) all appeals from and petitions for review of assessments of tax (and civil penalties thereon)

made by the District of Columbia." Not only did the District fail to raise this argument in the trial court, but as ETW points out, § 11–1201 concerns "assessments", but no assessment of a tax has been made in this case.

**18.** During the September 13, 1996 hearing on ETW's motion for summary judgment and for modification and extension of the July 7, 1995 temporary restraining order, ETW argued that the solid waste facility charge is "a tax on [i]nterstate [c]ommerce." In its main brief on appeal, ETW also characterized the solid waste facility charge as a tax. Consequently, an explanatory footnote was added to its reply brief: "The use of the word 'tax' to refer to this [solid waste facility] charge in the various briefs filed in this case is ... a technically incorrect usage, and is simply a colloquial description of the charge."

waste industry. The legislative history refers to "new revenues" resulting from the charge, and the use of the funds generated from the charge to enforce solid waste laws.[19] In addition, § 6–3457(f) mentions "revenues collected from the payment of the solid waste facility charge" as well as use of monies from the charge "to fund recycling activities," and the allocation of "[n]ot more than 20% of the solid waste facility charge ... for the enforcement of the requirements of this subchapter."

More useful in ascertaining whether the solid waste facility charge is a tax or a fee is a "three-part test that looks to different factors...." *Valero, supra,* 205 F.3d at 134. Under that three-part test, courts examine: "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." *Id.* (citing *San Juan Cellular Telephone Co. v. Public Serv. Comm'n,* 967 F.2d 683, 685 (1st Cir. 1992)); *Bidart Bros. v. California Apple Comm'n,* 73 F.3d 925, 931 (9th Cir.1996); *see also American Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Management Dist.,* 166 F.3d 835, 837 (6th Cir.1999) (quoting *Bidart, supra,*

73 F.3d at 931); *Wright v. Riveland,* 219 F.3d 905, 911 (9th Cir.2000), 2000 U.S.App. Lexis 15850 at 3. If the legislature imposes the charge, it is generally considered a tax, but if an administrative agency mandates the charge, it is usually considered to be a fee. *See National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). Therefore, since the solid waste facility charge was enacted by the District's legislature, it would be considered a tax under the first prong of the three-part test followed in *Valero Terrestrial Corp., supra.*

Turning to the second factor, the immediate population subject to the solid waste facility charge of course would be the operators of open solid waste facilities and the other types of facilities described in the Solid Waste Permit Act.[20] However, both the generators of the waste that is collected, and the transporters of the waste to the solid waste facility[21] may actually pay part of the cost of the charge through the fees imposed on them, directly or indirectly, by the operator of the solid waste facility. *See Valero, supra,* 205 F.3d at 134 (West Virginia statute imposing a

---

19. The September 20, 1995 legislative committee Report on Bill 11–36, the "Solid Waste Facility Permit Act of 1995," at p. 15 states:

Upon further review of the annual facility charge, the Executive recommends that the charge be reduced [from $10] to $7 [now $4.00] per ton, resulting in approximately $1.75 million in new revenues assuming 250,000 tons of permitted disposal capacity. The same report declares that the purpose of the legislation "is to prohibit the operation of an open solid waste facility in the District of Columbia," at p. 1, and that: "The $4 per ton charge was selected based upon information that the Committee received on what solid waste facilities (transfer stations, landfills, incinerators) charge to accept solid waste, host fees, and other considerations." Moreover, the November 4, 1998 legislative committee Report on Bill 12–582, "Solid Waste Facility Permit Act of 1995 Amendment Act of 1998," states, at p. 2, that the legislation "provide[s] funding [through the charge and fee structure] for law enforcement."

20. Section 6–3451(6) defines an "open solid waste facility" as: "any privately owned or operated solid waste disposal or solid waste handling facility where solid waste is stored or processed outside of a fully enclosed building or structure." Under § 6–3451(11), a "solid waste disposal facility" is described as: "any facility where solid waste is discharged, deposited, tipped, dumped, or placed for final disposal, including an incinerator, waste-to-energy facility, rubble fill, or landfill." Section 6–3451(13) provides: " 'Solid waste handling facility' means any facility where solid waste temporarily is deposited, or placed for processing, at any time prior to its final disposal at a solid waste disposal facility."

21. Section 6–3451(12) defines a "solid waste facility" as: "any privately owned or operated solid waste disposal facility or solid waste handling facility, which accepts solid waste that is not the incidental by-product of the facility's manufacturing or operational processes."

solid waste assessment fee "ensures that the cost of the charge is passed from the transporter of the waste to the generators of the waste, so to spread the cost to a significantly wider proportion of the population"). Since the solid waste facility charge is imposed upon those in the solid waste industry, the second prong of the three-part test would prompt a conclusion that the charge is a fee. But, "standing alone, the fact that an assessment targets only a narrow class of people is not enough to characterize the assessment as a fee." *Hedgepeth v. State of Tennessee,* 215 F.3d 608, 614 (6th Cir.2000), 2000 U.S.App. Lexis 13002 at 15 (quoting *Wright v. McClain,* 835 F.2d 143, 144–45 (6th Cir.1987)). Thus, the third factor in the test, the purposes for or use of the monies collected from the charge, is critical. As the court said in *American Landfill, Inc., supra,* "for cases where the assessment falls near the middle of the spectrum between a regulatory fee and a classic tax, the predominant factor is the revenue's ultimate use." 166 F.3d at 838 (citing *San Juan Cellular Tel. Co., supra,* 967 F.2d at 685; *Bidart Bros., supra,* 73 F.3d at 932). "[I]f the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax,' while if the benefits are more narrowly circumscribed then the charge will more likely qualify as a 'fee.' " *Valero Terrestrial Corp., supra,* 205 F.3d at 134 (citing *San Juan Cellular Tel. Co., supra,* 967 F.2d at 685).

 An examination of the District's statutory and regulatory scheme regarding illegal dumping, recycling, and the disposal of solid waste leads us to the conclusion that income from the solid waste facility charge would benefit the general public more than those who handle trash, recyclables and solid waste. In drafting the challenged statutes, the District's legislature was concerned about the impact on the health and safety of District residents of illegal dumping of waste in open areas, and the proliferation of unregulated companies that handle or process waste in the Dis-

trict. *See* REPORT ON BILL 12–582, THE "SOLID WASTE FACILITY PERMIT ACT OF 1998," *supra,* at 2; Council of the District of Columbia, Committee on Public Works and the Environment, REPORT ON BILL 10–249, THE "ILLEGAL DUMPING ENFORCEMENT ACT OF 1993," October 20, 1993, at 2–3; *see also* 21 DCMR Chapters 7 (Solid Waste Control) and 8 (Solid Waste Container Specifications), February 1998; D.C.Code § 6–2912(a):

It shall be unlawful for any person to dispose or cause or permit the disposal of solid waste, hazardous waste, or medical waste in or upon any street, lot, park, public place, or any other public or private area, whether or not for commercial purpose, unless the site is authorized for the disposal of solid waste, hazardous waste or medical waste by the Mayor.

To address these concerns, funds generated by the solid waste facility charge would benefit the general public through the development of new and additional methods of solid waste management, recycling activities, and enforcement of laws applicable to the disposal of solid waste. Thus, the funds would "serve[ ] public purposes benefitting the entire community." *American Landfill, supra,* 166 F.3d at 839. Moreover, "[t]he revenue's ultimate use as a benefit shared by the public and not just the waste disposal facilities indicates that the [charge] here is a tax." *Id.* at 839–40; *see also Hedgepeth, supra,* 215 F.3d at 613, 2000 U.S.App. Lexis 13002 at 9.

 Having concluded that the solid waste facility charge is a tax, and recognizing that ETW has not paid the $4.00 per ton charge, we now consider whether we are barred from addressing the constitutionality of this charge because of § 47–3307, the tax anti-injunction statute. In that regard, two inquiries are necessary: (1) Do the exceptions to the bar against jurisdiction under § 47–3307 apply in this case? (2) Has the District, or could it, effectively waive(d) the anti-injunction statute by not raising it prior to the filing

of its responsive and reply brief? The exceptions to the application of § 47–3307 are: "1) a finding that 'under no circumstances could the Government ultimately prevail,' and 2) that 'equity jurisdiction otherwise exists,' that is, proof of irreparable injury and inadequacy of the legal remedy." *American Tel. & Tel. Co.*, 563 A.2d at 1075 (quoting *Enochs, supra,* 370 U.S. at 6–7, 82 S.Ct. 1125) (other citations omitted).

At this stage of the litigation, and based on the record before us which reflects a conclusion by the trial judge that certain issues cannot be resolved without additional factual development, we are unable to say that "under no circumstances could the Government ultimately prevail" in the consolidated cases that are before us on interlocutory appeal. *Id.* Thus, one prong of the two-part test in *Williams Packing & Navigation Co., supra,* has not been met. We turn, then, to our second inquiry: Has the District, or could it, effectively waive(d) the anti-injunction statute by not raising it prior to the filing of its responsive and reply brief? Relying on our decision in *United Jewish Appeal Fed'n of Greater Washington, Inc., supra,* the District argues that it did not waive § 47–3307. In that case we held that under § 47–3307, the court had no jurisdiction in a matter involving the collection of real estate taxes, although the District did not

raise the anti-injunction statute until a post-judgment motion. Moreover, the District calls our attention to two federal cases construing the federal tax injunction statute in which the courts declared that the statute could not be waived: *Folio v. City of Clarksburg,* 134 F.3d 1211, 1214 (4th Cir.1998) ("This statutory provision is a jurisdictional bar that is not subject to waiver, and the federal courts are duty bound to investigate the application of the Tax Injunction Act regardless of whether the parties raise it as an issue"); *Cumberland Farms, Inc. v. Tax Assessor,* 116 F.3d 943, 945 (1st Cir.1997) ("Although Maine did not raise this point below, the [Tax Injunction Act's] commands are jurisdictional in nature and are not subject to waiver").

Notwithstanding the federal court's approach to the Federal Tax Injunction Act, this court has never explicitly held that § 47–3307 is not subject to waiver or estoppel.[22] In fact, the District previously has asked this court, on more than one occasion, to ignore § 47–3307 and proceed to a decision on the merits. *See American Tel. & Tel. Co., supra,* 563 A.2d at 1075 n. 16.[23] Moreover, in this case, we are confronted with a combination of extraordinary and stringent, indeed unique circumstances that was not present in *American Tel. & Tel. Co., supra.*[24] First, and crucial

22. In *American Tel. & Tel., supra,* we laid down the rightly stringent standard quoted above for invocation of equitable relief. We do not understand the case as otherwise absolutely barring the door to any consideration whatever of waiver or estoppel, should the court be faced with uniquely " 'exceptional and stringent' " circumstances. 563 A.2d at 1076 (part V). *See also 1776 K Street Assocs., supra;* 446 A.2d at 1114 n. 1. *District of Columbia v. Keyes,* 362 A.2d 729, 737 (D.C. 1976); and *Green, supra,* 310 A.2d at 852, which in some sense were binding on *American Tel. & Tel. See generally* 72 Am.Jur.2d (State and Local Taxation) § 1115 *et seq.*

23. Footnote 16 reads, in part:

 [T]his case marks at least the third time the District of Columbia has briefed the issue of lack of jurisdiction under the anti-

injunction statute on appeal, but then has subsequently requested a decision on the merits nonetheless. *See 1776 K Street Assocs. v. District of Columbia,* 446 A.2d 1114, 1114 n. 1 (D.C.1982) ("While requesting a decision on the merits 'in the public interest' [the District] ha[s] appropriately noted that suits to enjoin the collection of taxes are prohibited. . . ."); [*District of Columbia v.*] *Green,* 310 A.2d [848], 852 [D.C.1973] (the "jurisdictional points are not pressed with vigor here, each of the parties preferring a decision on the merits."). . . .

24. We emphasize that it is the combination of circumstances, not any individual aspect, that is controlling. For example, the District is not empowered to "waive" the statute in any normal sense of that word, and a trial or appellate court has the right to raise the statutory bar sua sponte. Here, however, we have

to the result, although the complaints in these consolidated cases were filed originally in 1994, the District did not raise the anti-injunction statute until it lodged its responsive and reply brief in this court in January 1999. Second, the inclusion of the solid waste facility charge as a tax subject to the anti-injunction prohibition is, at best, at the margin of the statute and does not appear to implicate its key concerns. Third, the trial court granted injunctive relief to ETW because of a finding that the company would suffer irreparable harm, that is, as we discuss below, its very existence would be threatened if the District is permitted, (especially at this stage of the litigation before all issues have been resolved), to enforce the payment of the statutory charges or fees under the Solid Waste Permit Act. Fourth, as indicated below, the issue of the constitutionality of the solid waste facility charge cannot be resolved without further proceedings in the trial court; thus, after applying the analytical framework which we set out below, the trial court may again conclude that the charge is unconstitutional under the commerce clause. Fifth, because further proceedings are essential in the trial court, and since there are several other issues which must be addressed in this case following the completion of discovery, including due process questions, ETW may not be afforded a speedy resolution of its complaints. Therefore, unless we determine that the trial court abused its discretion in modifying and extending the July 7, 1995 temporary restraining order against the District, the equitable approach is to conclude, on the extraordinary, stringent, and unique circumstances presented to us in these consolidated interlocutory appeals, that § 47–3307 does not constitute an absolute bar to our jurisdiction.

a complete failure by the District, the very entity whose fiscal operations the statute is intended to protect, to raise the issue for an extraordinary extended period of time and even then only by way of a reply brief in an appellate court. Similarly, the fact that the trial court has neared a judgment on the

*Review of the Preliminary Injunction Factors*

■■■■ "'The decision to grant or deny preliminary injunctive relief is committed to the sound discretion of the trial court.'" *District of Columbia v. Group Ins. Admin.,* 633 A.2d 2, 21 (D.C.1993) (quoting *Stamenich v. Markovic,* 462 A.2d 452, 456 (D.C.1983)). In reviewing the trial court's order modifying and extending the July 7, 1995 temporary restraining order, we are required to:

(1) examine the trial court's findings and conclusions to see if they are sufficiently supported by the record; [and] (2) assure that the trial court's analysis reflects a resolution of all the issues which necessarily underlie the issuance of an injunction. . . .

*Id.* at 22. A preliminary injunction may not be granted unless:

the moving party has clearly demonstrated (1) that there is a substantial likelihood [it] will prevail on the merits; (2) that [it] is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to [it] from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*Id.* at 21 (quoting *Wieck v. Sterenbuch,* 350 A.2d 384, 387 (D.C.1976)) (footnote omitted). Furthermore,

In determining whether to grant a motion for a preliminary injunction, "the most important inquiry is that concerning irreparable injury . . . because the primary justification for the issuance of a preliminary injunction 'is always to prevent irreparable injury so as to pre-

substantive merits would not itself be sufficient, any more than it was in the cited case, nor would irreparable harm alone suffice. The anti-injunction statute is subject to strict construction and application, and only the rarest of combined circumstances can warrant its equitable override.

serve the court's ability to render a meaningful decision on the merits.' " Id. at 22 (quoting *Wieck, supra,* 350 A.2d at 387–88) (quoting *Canal Auth. v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974)).

**Irreparable Harm**

In her July 7, 1995 order granting ETW's motion for a temporary restraining order, Judge Mitchell–Rankin found that eighty percent of ETW's business comes from government contracts, and that its continued existence was at risk. As the judge stated:

> A closure of [ETW's] facility and the attendant inability to service these [government] contracts would result in the termination of these contracts (for the convenience of the government), and the cessation of ETW's business. In addition, ETW has liabilities in excess of one million dollars ...; and its inability to generate the referenced revenue would result in the cessation of [ETW's] business and the inability to service its current debt posture.

Judge Mitchell–Rankin also determined that "a violation of constitutional rights constitutes, as in this case through a violation of the Commerce Clause of the Constitution, irreparable harm *per se.*" Furthermore, Judge Eilperin based his finding of irreparable harm on a threat to ETW's continued business existence: "[E]specially considering the District's position that ETW lacks a valid certificate of occupancy, enforcement carries a real threat that ETW would be put out of business or, at a minimum, subjected to significant expense in seeking a permit for its operations." Judge Eilperin emphasized the commerce clause issue, and the District's failure to show, through supplemental responses to ETW's interrogatories, that public health complaints had been lodged against ETW. While " 'economic loss does not, in and of itself, constitute irreparable harm,' " such harm will be found if economic " 'loss threatens the very existence of the movant's business.' " *Id.* at 23 (quoting *Wis-*

*consin Gas Co. v. FERC,* 244 U.S.App. D.C. 349, 354, 758 F.2d 669, 674 (1985)) (other citations omitted). Here, we have a factual finding by two different trial court judges that the record evidence is sufficient to show the threat to ETW's continued existence without an injunction.

Nonetheless, the District argues, in essence, that the Solid Waste Facility Permit Act did not cause irreparable harm to ETW; rather ETW was the victim of a self-inflicted wound because it failed to apply for a permit under the Act, as did other waste transfer stations. In addition, the District states that an adequate remedy at law was available to ETW due to the possibility of refunds and damages should the Solid Waste Facility Act be declared unconstitutional as applied to ETW. Judge Mitchell–Rankin rejected this contention, stating:

> The government's argument[,] that ETW's failure to submit a timely application effectively precludes their challenge to the Act and its regulations, and makes impossible a demonstration of irreparable harm[,] fails since it is the enforcement of the Act either in requiring the closure of the facility for failure to comply with the requirements of the Act and its regulations which is the harm which is sought to be avoided.

Since "[o]ur role on review of the trial court's action [granting or denying injunctive relief] is limited," *Simpson v. Lee,* 499 A.2d 889, 892 (D.C.1985), and the question of whether the Solid Waste Facility Permit Act threatens the very existence of ETW's business is largely a factual issue, we see no reason to disturb the trial court's conclusion that ETW sustained its burden of showing irreparable harm.

**Substantial Likelihood of Success on the Merits**

Both Judges Mitchell–Rankin and Eilperin concluded that the Solid Waste Permit Act presented constitutional problems under the commerce clause. Judge Mitchell–Rankin found "a substantial likelihood

that a violation of the [c]ommerce [c]lause exist[s] by the enactment and enforcement of the [Solid Waste Facility Permit Act]." In his analysis of the solid waste facility charge, Judge Eilperin stated, in part, that: "Section 8(b) of the [Solid Waste Permit Act] imposes a $4 per ton fee for solid waste deposited at a solid waste facility." Yet, the Solid Waste Permit Act specifies that the charge is imposed "for operating a solid waste facility in the District." D.C.Code § 6–3457(a). In reaching his conclusion that the charge is unconstitutional regarding waste originating outside the District, Judge Eilperin also emphasized the solid waste rather than the operations of ETW, citing *Champlain Realty v. Brattleboro,* 260 U.S. 366, 372, 43 S.Ct. 146, 67 L.Ed. 309 (1922), which focused on "logs" as objects of interstate commerce. Judge Eilperin concluded in relevant part:

> Here, the solid waste originates outside the District, is processed in the District for less than 24 hours to facilitate interstate shipment by compacting it and transferring it to long haul trucks and is shipped out of the District.... Thus, the solid waste deposited at ETW is already in interstate commerce and not subject to local taxation. The $4 per ton tax of Section 8(b) impermissibly burdens interstate commerce and is unconstitutional as applied.

Rather than placing emphasis on the solid waste, the analysis of the constitutionality of the solid waste facility charge requires a focus on the statutory language, "for operating a solid waste facility in the District." Thus, the focus is on the operation of the solid waste facility, even though the solid waste facility charge is measured by the number of tons of waste processed annually. As the Supreme Court said in *C & A Carbone, Inc. v. Town of Clarkstown, New York,* 511 U.S. 383, 391, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) in determining the constitutionality of a flow control ordinance, "the article of commerce is not so much the solid waste itself, but rather

the service of processing and disposing of it."

■ We now turn to the governing law and the applicable legal principles for determining the constitutionality of the solid waste facility charge. Article 1, section 8, clause 3 of the Constitution of the United States gives Congress the power to regulate commerce among the states. The commerce clause also "has long been understood to have a 'negative' [or dormant] aspect that denies the States the power unjustifiably to discriminate against or burden" the free flow of commerce. *Oregon Waste Sys., Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Generally, in conducting analyses of the constitutionality of statutes under the commerce clause, the Supreme Court has recognized two possible approaches. The first approach asks, "whether the [statute] discriminates against interstate commerce," *C & A Carbone, Inc., supra,* 511 U.S. at 390, 114 S.Ct. 1677; *see also Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); or "overtly discriminates" against interstate commerce, *see U & I Sanitation v. City of Columbus,* 205 F.3d 1063, 1067 (8th Cir. 2000) ("[I]f the law in question overtly discriminates against interstate commerce, then we will strike the law unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'"). The second approach focuses on, "whether the [statute] imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits'", *C & A Carbone, Inc.,* 511 U.S. at 390, 114 S.Ct. 1677 ( quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

■ Specifically, in cases involving taxes on interstate activities, the Supreme Court has adopted an analytical framework outlined in *Complete Auto Transit,*

*Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), a case involving a tax on the privilege of conducting business within the state: "State taxes on interstate activities [are] to be upheld if four specific criteria [are] satisfied: (1) the taxed activity must have a substantial nexus with the taxing jurisdiction, [*see Quill Corp. v. North Dakota,* 504 U.S. 298, 315, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); *National Geographic Soc'y v. California Bd. of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977)]; (2) the tax must be fairly apportioned, [*see Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 184–191, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995)]; (3) the taxing legislation must not discriminate against interstate commerce, [*see Amerada Hess Corp. v. Director, Div. of Taxation,* 490 U.S. 66, 75, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989)]; and (4) the amount of the tax must be fairly related to the services provided the taxing jurisdiction, [*see Goldberg v. Sweet,* 488 U.S. 252, 266–67, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989)]." *Homier Distrib. Co., Inc. v. City of Albany,* 90 N.Y.2d 153, 659 N.Y.S.2d 223, 681 N.E.2d 390, 396 (1997) (discussing *Complete Auto Transit, Inc., supra*). In the context of the case before us, one related principle should be emphasized: "a local regulation or tax is discriminatory without regard to its underlying purpose when it entails 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* 659 N.Y.S.2d 223, 681 N.E.2d at 394 (quoting *Oregon Waste Sys., Inc., supra,* 511 U.S. at 99, 114 S.Ct. 1345).

Application of the foregoing approaches and legal principles undoubtedly requires factual development which is not yet available to this court. Furthermore, the trial court has not had an opportunity to consider all facets of the District's statutory and regulatory scheme applicable to solid waste facilities and solid waste disposal.[25] Nor has the court itself had an opportunity to determine what are the pertinent underlying facts essential to a resolution of the commerce clause issues. Thus, given the necessity of additional factual development, and recognizing Judge Eilperin's preliminary conclusion that: "ETW has the better of the argument that the regulatory scheme unconstitutionally forces the interstate commerce hauler to pay a double fee—namely, the D.C. collection fee and any surcharge imposed by the State in which it ultimately dumps ...," we see no reason to disturb Judge Mitchell–Rankin's and Judge Eilperin's conclusions that the factor of substantial likelihood of success on the merits should be resolved in favor of ETW for purposes of preliminary injunctive relief. We are, however, constrained to remand for further consideration the ultimate partial summary judgment on the solid waste facility charge.

**Balance of the Harm and the Public Interest Factors**

▇▇ Judge Mitchell–Rankin declared that the balance of harm factor tilted toward ETW because it could "lose its entire operations if the Act is enforced." In contrast, she asserted that, "[t]he District would not suffer demonstrable harm if [injunctive] relief ... is granted, since such an order would have little impact on its day to day operations concerning solid waste transfer and management." With respect to the public interest factor, Judge Mitchell–Rankin decided that "[t]he public interest is served by preventing impermissible burdens on interstate commerce which have the effect of stifling competition in the recycling, waste management and transfer business." On the record before us, we see no evidence indicating that the injunction presents a danger to

---

25. In addition to the statutory provisions mentioned in this opinion, there are relevant regulations set forth in the DCMR *see,* for example, 21 DCMR § 720 (Fees), 21 DCMR § 730 (Solid Waste Facility Application Re-quirements), 21 DCMR § 733 (Solid Waste Facility Operating Requirements); and 21 DCMR § 737 (Reporting Requirements; this section contains two rules relating to the solid waste facility charge).

public health and safety. Consequently, we discern no basis for disturbing the trial court's assessment of the balance of harm and public interest factors.

### The District's Zoning Laws

■■■ One final issue needs to be addressed regarding the preliminary injunction. The District argues that the trial court enjoined it from enforcing its zoning laws against ETW. However, nothing in the July 7, 1995, or September 27, 1996, orders prevents the District from enforcing its zoning laws. In fact, in its main brief, the District stated in a footnote: "It is not clear that the order was intended to apply to zoning enforcement." Moreover, in its responsive and reply brief, in a footnote, the District cited Super. Ct. Civ. R. 65 which provides, in pertinent part, that: "Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained, and is binding only upon the parties...." Since the District's zoning laws are not mentioned in the July 7 and September 27 orders, they may not be read to preclude the District's enforcement of its zoning laws.

Based upon our analysis, we conclude that the trial court did not abuse its discretion by modifying and extending the July 7, 1995 temporary restraining order.

*The Solid Waste Facility Charge, the Collection Fee and the Recycling Surcharge*

The foregoing analysis enables us to dispose of the remaining issues, relating to the solid waste facility charge, the collection fee and the recycling surcharge. Since Judge Eilperin emphasized the "solid waste" rather than the statutory language "operating a solid waste facility" in examining the constitutionality of the solid waste facility charge, and thus, has not had an opportunity to resolve the issue using the analytical framework set forth in this opinion, and because factual development may be relevant to his conclusions, we remand the case to the trial court for further proceedings regarding the solid waste facility charge.

Finally, we need not address the issues raised by ETW's appeal, that is, the recycling surcharge and the collection fee, because, even assuming, without deciding, that we have jurisdiction over these matters, we agree with Judge Eilperin that further factual development is essential to a determination of the constitutionality of the collection fee and recycling surcharge.

In summary, for the foregoing reasons, we conclude that: (1) this court has jurisdiction to entertain the interlocutory appeals relating to the injunction and the solid waste facility charge; (2) on the peculiar circumstances of this case, § 47–3307 does not bar this court from considering the constitutionality of the solid waste facility charge, which we deem to be a tax rather than a fee under applicable case law; (3) the trial court did not abuse its discretion in modifying and extending the July 7, 1995 temporary restraining order; and (4) nothing in the trial court's July 7, 1995, or September 27, 1996, orders precludes the District from enforcing its zoning laws. Furthermore, we are constrained to remand the trial court's judgment regarding the solid waste facility charge for further proceedings consistent with this opinion. Finally, we agree with the trial court that additional factual development is essential to the resolution of issues regarding the collection fee and the recycling surcharge, and thus, do not determine whether we have jurisdiction over ETW's appeal; nor do we reach the merits of the issues presented by ETW's interlocutory appeal.

Accordingly, we affirm the trial court's judgment in part, and remand these cases to the trial court for further proceedings consistent with this opinion.