**DISTRICT OF COLUMBIA, a municipal corporation, et al., Appellants,**

v.

**Clarzell GREEN et al., Appellees.**

**No. 7539.**

District of Columbia Court of Appeals.

Argued Sept. 7, 1973.

Decided Oct. 9, 1973.

Louis P. Robbins, Asst. Corp. Counsel, Washington, D.C., with whom C. Francis Murphy, Corp. Counsel, and Henry E. Wixon, Robert E. McCally, Richard W. Barton, David P. Sutton, Kenneth A. Pels and Richard L. Aguglia, Asst. Corp. Counsels, Washington, D.C., were on the brief, for appellants.

Gilbert Hahn, Jr., Washington, D.C., with whom Jack C. Sando, Washington, D.C., was on the brief, for appellees.

Philip W. Amram, Daniel G. Grove, Washington, D.C., and Steven L. Engelberg also entered appearances for appellees.

Before REILLY, Chief Judge, and KELLY and NEBEKER, Associate Judges.

KELLY, Associate Judge:

This appeal is from an order entered in the Superior Court, Tax Division, enjoining appellants from using, for purposes of taxation of single-family residential properties within the District of Columbia, unequal levels of assessment of estimated market value in determining the assessment, valuation or equalization of such properties, and from assessing such properties at a level of assessment other than 55% of estimated market value unless and until an equal level of assessment is established by the District after full compliance with the provisions of the District of Columbia Administrative Procedure Act (DCAPA).[1] The issues outlined by appellants for review are (1) whether the trial court erred in holding temporarily unequal single-family property levels of assessment (debasement factors)[2] of 55% and 60% to be unconstitutionally discriminatory when such temporary inequality resulted from a city-wide cyclical reassessment work program designed to ultimately equalize all single-family property assessments with the multi-family and commercial properties debased at 65%; (2) whether the trial court's holding compels an unconstitutional discrimination against multi-family and commercial properties and 20% of the single-family properties in the District of Columbia; (3) whether the development of a cyclical assessment program designed to bring certain properties into compliance with constitutional and statutory mandates for equalization is "rulemaking" within the meaning of the DCAPA, and (4) whether the failure of some appellees to exhaust their administrative remedies and of others to pursue their statutory legal remedies precluded the trial court from granting injunctive relief. Appellees are in substantial agreement with the issues appellants present for review, demurring only to the suggestion that any question of a constitutionally prohibited discrimination against

---

1. D.C.Code 1972 Supp., § 1–1501 et seq.

2. The terms "level of assessment" and "debasement factor" are used interchangeably throughout this opinion.

owners of properties in categories other than single-family properties is embraced within or even relevant to this appeal.

I

In brief explanation of the essential background to this appeal, there are three components of the mathematical process used to determine the dollar amount of tax due the District from an individual owner of real property each year; namely, the market value of the property, the debasement factor (level of assessment) to be applied to that value to determine the assessment (assessed value), and the tax rate. Market value (also referred to as estimated market value) is the fair market value of a particular property as determined from time to time by District assessors. The debasement factor is the percentage of market value upon which the tax will be levied. The tax rate is expressed in terms of dollars per hundred and is currently $3.32 per each $100 of an individual property's assessed value.

The assessment for an individual taxpayer is determined by multiplying the market value of the property by the debasement factor or level of assessment.[3] The tax rate applied to the assessed value of the property is set by the City Council after notice published in the District of Columbia Register and, like the level of assessment, is fixed. The third component of the above equation, market value, is a variable with each individual property having a unique estimated value. Upon receipt of a tax bill, an aggrieved taxpayer may complain of an alleged unfair assessment to the Board of Equalization and Review (Board)[4] and, beyond that, appeal to the Tax Division of the Superior Court.[5]

For several years immediately prior to calendar year 1969, if not before, all single-family residential properties in this city had a debasement factor of 55% and all multi-family residential, commercial and industrial real property was assessed at 65% of estimated market value. Thereafter, in a planned cyclical reassessment program, conceived and orally implemented by the Director of Finance and Revenue, the level of assessment for approximately 33,000 single-family residential properties was changed from 55% to 60% for fiscal year 1973, and, in preparing the tax rolls for fiscal year 1974, an additional 44,485 single-family properties were debased at 60%.[6] The level of assessment of nearly 19,000 single-family residential properties remained at 55%.

Of the 44,485 taxpayers who at the end of 1972 received notices of assessments for fiscal year 1974, only 1,044 appealed, three of whom somehow ascertained the existence of, and raised as an issue, the increased level of assessment of their properties. Of the eleven named petitioners below (appellees), five unsuccessfully complained to the Board of Equalization and Review of alleged unfair assessments; six did not so complain. This class action was brought by petitioners on behalf of themselves and others so situated to enjoin the respondents (appellants) from applying the 60% debasement factor against their properties unless and until the same level of assessment was applied to all single-family residential properties within the District after compliance by the District with the pertinent provisions of the DCAPA. After a lengthy trial the court granted appellees the relief sought, accompanying its order with a comprehensive and learned memorandum opinion with which we are in full accord.[7]

3. Example: A house valued at $100,000 with a debasement factor of 60% is assessed at $60,000 and taxed at the rate of $3.32 per $100 of assessed value—$1,992.00.

4. D.C.Code 1972 Supp., § 47–709; § 47–2405.

5. D.C.Code 1972 Supp., § 11–1202.

6. Assessment is done on a calendar year basis for the following fiscal year.

7. Wash.L.Rep., Vol. 101, No. 172, p. 1737; No. 173, p. 1749; No. 174, p. 1761 (1973).

The critical factors upon which we focus in our decision are (1) that the District's cyclical reassessment program was undertaken in a manner which resulted in unequal levels of assessment within a single class of assessed property, and (2) that no notice was given to District of Columbia single-family residential property owners that the level of assessment of their properties was in the process of change.

## II

Relying upon D.C.Code 1967, § 47–709, appellants challenge the jurisdiction of the trial court to determine the claims of the six appellees who failed to complain of their increased assessments to the Board, alleging a failure to exhaust their administrative remedies;[8] assert that the appellees who did complain to the Board are barred from suit by language in D.C.Code 1972 Supp., §§ 47–2403—2405 specifying that the court may not entertain a taxpayer's petition until after October 1, and after payment of the tax in full, and claim that the trial court erred in issuing an injunction in the face of D.C.Code 1967, § 47–2410 which provides that

No suit shall be filed to enjoin the assessment or collection by the District of

Columbia or any of its officers, agents, or employees of any tax.

■ These jurisdictional points are not pressed with vigor here, each of the parties preferring a decision on the merits. Consequently, we simply point out that appellants' latter argument would be readily accepted except that the trial court found the facts of this case to be so exceptional and extraordinary as to merit equitable relief and, as the Court said in Miller v. Standard Nut Margarine Co., 284 U.S. 498, 509, 52 S.Ct. 260, 263, 76 L.Ed. 422 (1932):

[W]here complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector. . . . [Citations omitted.][9]

■ Additionally, the trial court found that since the six named petitioners (appellees) who bypassed the Board could not have known of the changed level of assessment until it was reluctantly made public in this lawsuit in June of 1973, they were unable to pursue the administrative remedy created by statute prior to cutoff date of April 1, 1973.[10] It also found, in

8. D.C.Code 1972 Supp., § 47–709:

The valuation of the real property made and equalized as aforesaid shall be completed not later than the first Monday of May annually. The valuation of said real property made and equalized as aforesaid shall be approved by the Commissioners not later than July 1, annually, and when approved by the Commissioners shall constitute the basis of taxation for the next succeeding year and until another valuation is made according to law, except as hereinafter provided. Any person aggrieved by any assessment, equalization or valuation made may within six months after October 1 of the year in which such assessment, equalization, or valuation is made, appeal from such assessment, equalization, or valuation in the same manner and to the same extent as provided in sections 47–2403 and 47–2404: Provided, however, That such person shall have first made his complaint to the Board of Equalization and Review

respecting such assessment as herein provided, except that, in case of increase of valuation of real property over that for the immediately preceding year, where no notice in writing of such increase of valuation is given the taxpayer prior to March 1 of the particular year, no such complaint shall be required for appeal.

9. See also Allen v. Regents of University System of Georgia, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938).

10. In its words: "The court is not persuaded by this argument and cannot believe that Congress intended that the statute be subverted to include deceit of the populace, by either unintentional oral and written misinformation (at best) or by deliberate misstatement (or deliberate omission) of oral and written information (at worst)." R. at 666.

effect, that under the extraordinary circumstances of this case, outlined at length in its memorandum opinion and not repeated here, the petitioners who did not appeal to the Board were in reality afforded no effective administrative remedy. Moreover, the court saw no reason to require the parties who in good faith sought administrative review to wait until October 1 to apply for relief, after payment of tax, when those bypassing the useless administrative procedure were permitted to proceed, stating that to accept such an argument "would, in effect, add yet another dimension of inequity to a situation already surrounded by unfairness, secrecy and lack of candor." [11] The evidence of record supports the findings of the trial court and, as a consequence, it was not error to entertain the petition for injunction. As the Circuit Court said in Tumulty v. District of Columbia, 69 App.D.C. 390, 399–400, 102 F.2d 254, 263–264 (1939) :

> We think it clear that all administrative remedies in matters of taxation must be exhausted before resort can be had to court action. Nelson v. First Nat. Bank, 8 Cir., 42 F.2d 30, but think *it equally clear that when the assessment is void, the taxpayer may resort to equity for relief, without following statutory remedies.* . . . [Emphasis supplied.]

### III

■ Appellees successfully contended in the trial court that the fixing of a level of assessment for real property is rulemaking within the meaning of the District of Columbia Administrative Procedure Act.[12] They conceded there, and concede here,

that prior to the effective date of the DCAPA appellants had a right to make a rule setting the level of assessment at 55% of market value for residential property in the District and 65% of market value for commercial property without notice to or opportunity by the public to be heard. Conceded also is appellants' right at any time to change the level of assessment of residential property to a higher percentage of market value if it is done in compliance with the pertinent provisions of the DCAPA.

Appellants argue that the Constitution and the pertinent statutory provision[13] governing assessment of real property compel the same level of assessment be applied to *all* real property in the District of Columbia; consequently, any change in the level of assessment for single-family residential property in the process of accomplishing equalization in assessment does not constitute a rule within the meaning of the DCAPA.

D.C.Code 1972 Supp., § 1–1502(6) and (7) defines the terms "rule" and "rulemaking" as :

> (6) the term "rule" means the whole or any part of any Commissioner's, Council's, or agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Commissioner, Council, or of any agency;

> (7) the term "rulemaking" means Commissioner's, Council's, or agency process for the formulation, amendment, or repeal of a rule;

---

11. R. at 667.

12. D.C.Code 1972 Supp., § 1–1507(c). The DCAPA, effective October 21, 1969, required that all administrative rules then in effect be published in the District of Columbia Register by October 21, 1970. It is undisputed that no rules governing the method of assessment of real property have been published.

13. D.C.Code 1967, § 47–713, provides in pertinent part:
All real estate in the District of Columbia subject to taxation, including improvements thereon, shall be listed and assessed at not less than the full and true value thereof in lawful money.

The trial court found, correctly we think, that the interpretation or implementation of the words "full and true value" contained in § 47–713 of the Code was a rule within the meaning of § 1–1502(6) and its formulation was rulemaking within the definition of § 1–1502(7).

The meaning of "full and true value" of single-family residential properties had for a number of years been 55% of estimated market value. This 55% debasement factor, albeit unpublished, was, under the Code definition, a rule. Both the tax rate and the debasement factor are fixed values in the assessment equation. The setting of the tax rate by the City Council is admittedly a rule which must be published, with an opportunity for a public hearing provided for by the DCAPA. Setting or changing the debasement factor affects the final tax bill in exactly the same manner as does the setting of the rate, and to allow the debasement factor to be secretly established or changed would completely frustrate the purpose of being able to review the tax rate later when it is set each year.

Appellants argue that since they are constitutionally required to achieve equalization of the level of assessment of all real property, commercial and residential, a change of the debasement factor is not rulemaking within the meaning of the DCAPA. Should this constitutional requirement exist, however, it does not compel the conclusion that the District may not be required to accomplish its goal by constitutional means or that the necessary changes of levels of assessment in the process are not rules and rulemaking as defined in the DCAPA.

This court has held that a Commissioner's Order directing the Department of Human Resources to set the level of public assistance payments at 75% of the public assistance standards to be a rule, stating that "Commissioner's Order No. 70–265, whether we consider it an *implementing* directive, as Corporation Counsel charac-

terizes it, or *prescribing* policy, is a 'rule' as defined by the D.C. APA. . . ." [Footnote omitted.] Junghans v. Department of Human Resources, D.C.App., 289 A.2d 17, 23 (1972). A like holding is required here.

IV

■ Appellants contend that the tax policy of the District has always been to uniformly apply a 65% debasement factor to *all* real property in the District of Columbia, both residential and commercial. This "policy", however, has never been articulated to the general public and was apparently unknown to some assessors. The facts are that until 1969 the District compiled and used a real estate assessment manual designed to achieve a debasement of 65% of value, there being no identifiable market value at that time to debase. Sales ratio studies undertaken in 1968 revealed, however, that some single-family residential properties were actually debased as low as 40%, although the desired 65% factor for multi-family and commercial properties was substantially achieved. As a result, the District developed a reassessment program to equalize single-family residential properties with other real property at a 65% level of assessment. In an effort to accomplish a common debasement factor while maintaining relative equalization within the single-family residential class a "stair-step" approach was decided upon as the means to attain the desired result over a period of time, an approach necessitated both by budgetary and manpower considerations. The debasement factor of all single-family residential properties was first raised to 55%, the next planned step being to raise the level of assessment to 60% and the final goal being to elevate the debasement factor of all such properties to 65%. Thus, the level of assessment on over 33,000 single-family residential properties was raised to 60% in fiscal 1973, and an additional 44,485, those at issue in this case, had been entered on the tax rolls

for fiscal 1974 at 60%. Approximately 19,000 properties remain debased at 55%.

The District of Columbia has no rule dividing real property into various classes for the purpose of taxation. The only requirement of these *ad valorem* taxes is that they be administered in a fashion that results in equalization of the tax burden on all property owners.[14] The amount of a property owner's tax bill must be related as nearly as possible to the value of his property as compared to the value of the property of others. The ratio of his property's value to the total value of property in the District should parallel the amount of tax he pays compared to total taxes paid by all property owners.

■ Equalization depends directly on a fair and critical assessment of each piece of real property in the District. As expert witnesses for the District testified, assessment is an art which requires an experienced eye. It is therefore important, if taxes are to be equalized, that individual assessments be done thoroughly. Appellants have stressed that they have been unable, due to fiscal and manpower shortages, to effectuate an adequate assessment of all property in the District each year, and this is understandable. Under such circumstances a cyclical assessment program may be permissible, provided any inequalities resulting therefrom are of an accidental and temporary character. *See, e. g.,* Sunday Lake Iron Co. v. Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918); Johnson v. County of Ramsey, 290 Minn. 307, 187 N.W.2d 675 (1971); Carkonen v. Williams, 76 Wash.2d 617, 458 P.2d 280 (1969) (en banc); Skinner v. New Mexico State Tax Commission, 66 N.M.

221, 345 P.2d 750 (1959). Indeed, appellees agree that if the District had engaged in a cyclical program of adjusting the fair market value of properties in the city one group at a time, this case would not have arisen. But the District did not follow this course. Instead, as the record shows, it chose to apply different debasement factors to the same class of property in the same year and, in so doing, denied the appellees equal protection of the laws by discriminating among residential taxpayers.[15]

In the case of Weissinger v. Boswell, 330 F.Supp. 615, 621–622 (M.D.Ala.1971), the court declared unconstitutional under Alabama's *ad valorem* property tax system the application of two different levels of assessment to the same class of property, stating that ". . . while the Fourteenth Amendment does not require precise equality or uniformity in taxation, or prohibit inequality in taxation which results from mere mistake or error in judgment of tax officials, it does 'secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' . . ." [Footnotes omitted.]

The justification the District offers for the admitted intentional disparity of debasement factor applied to taxpayers within the same class is that the "stair-step" approach was the only way to bring all properties to the uniform level of assessment of 65% without seriously frustrating the only long-range goal of the tax system —equalization. The trial court did not accept the logic of this conclusion, nor can we.

14. Allied Stores of Ohio v. Bowers, 358 U.S. 522, 526, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); Hillsborough T P v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); Colgate v. Harvey, 296 U.S. 404, 423, 56 S.Ct. 252, 80 L.Ed. 299 (1935); Wells Fargo & Co. v. Johnson, 214 F. 180 (8th Cir. 1914), aff'd, 239 U.S. 234, 36 S.Ct. 62, 60 L.Ed. 243 (1915).

15. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), reads the Fourteenth Amendment equal protection clause into the due process clause of the Fifth Amendment to apply it to the District of Columbia.

The only variable in the tax equation for real property is the estimated fair market value. As the District admits, when the real estate market and other factors cause the fair market value to fluctuate, nearly constant reassessment is necessary, though not always feasible. If actual fair market value is determined by the amount realized in an arm's length sale of property, a comparison between the latest assessed value and this sales value constitutes the assessment/sales ratio. The disparity between the two values is expressed by a dispersion coefficient. The higher the coefficient, the greater the difference between the last assessed fair market value and the fair market value indicated by sale. Various factors may account for such a difference, but in any event the Board of Assessors is interested in minimizing the coeffecient of dispersion.

The assessment/sales ratio may well vary in different parts of the District, and even within the same block. This disparity inevitably produces the undesirable result of placing unequal tax burdens on persons owning property with the same fair market value. For example, if two different taxpayers own property identical in fair market value but one property is currently assessed at a higher value than the other due to the inability of the assessors to value all property every year, taxpayers owning property of identical values pay different tax bills. As another example, if the property of each of these taxpayers is currently assessed at the same market value but as part of a "stair-step" approach to reach a uniform 65% debasement value one level of assessment rises to 60% while the other remains at 55%, the taxpayers owning property worth the same amount in the taxable year have different tax bills.

In neither of the above examples has the goal of equalization been reached. Yet the two situations are distinguishable in impor-tant ways. In the first situation the lack of equalization between taxpayers is undesirable but permissible because caused by logistical problems which may be temporarily beyond the power of the city to correct. In the second case the lack of equalization is caused by an intentional and arbitrary application of two different debasement factors to identical properties.[16] The aggrieved taxpayer in the first example may complain to the Board of Equalization and Review if he feels that his assessment is too high and, since the assessment of fair market value is admittedly a rather subjective art, by requesting reconsideration of his valuation, he may be successful in lowering his assessment. The facts of the instant case show that in the second example the aggrieved taxpayer has no meaningful ability to challenge his assessment at all. No judgment would be made in his case as the new debasement factor was arbitrarily determined as was its applicability to certain real property.

Estimated market value, being the only variable in the equation determining the amount of tax owed, would appear to be the factor to be periodically adjusted to reflect changes in property values which the District recognizes occur for many different reasons that are difficult to forecast. If the District desires, or feels compelled, to apply an equal debasement factor across the board to all real property within the District, however, the proper course would be to formulate such a rule and publish it in accordance with the procedure prescribed by the DCAPA. An immediate raise to 65% might well be politically unpleasant, as the District clearly recognized but, if the need to raise the level of assessment to 65% is as compelled as the District contends, this result is unavoidable. Moreover, it is just as unavoidable using the "stair-step" approach although perhaps not as visible. In fact, evidence before the trial court demonstrated the assessments in

---

16. The District argues that one of its exhibits in evidence demonstrates that in reality the differential in levels of assessment resulted in greater equalization than before, but appellees disagree and the trial court did not so find nor was it required to do so.

years where the "stair-steps" were being used caused assessment increases that went above and beyond the increases that would have been caused by property appreciation alone. This should be no surprise, for any raise in the debasement factor must raise the assessment. The fair market value cannot be held below its true level while the debasement factor is inched towards 65% simply to keep taxes the same, at least if the concept of fair market value is to have any clear and understandable meaning. And as already mentioned, the facts of this case have highlighted the importance to the taxpayer of an accurately stated fair market value; it is the only element in the tax formula to which he can meaningfully object. If real increases in his property assessment are disguised in the form of a higher debasement factor, he is totally remediless within the normal avenues for seeking redress.

■ Finally, appellants complaint that the trial court's order "convert[s] a relatively equalized tax roll into a patently discriminating tax roll." [17] The trial court determined that the assessments at issue were void because of a differential in levels of assessment within one class of real property, and the District cannot now be heard to say in this appeal that in attempting to cure one allegedly discriminatory method of assessment between single-family residential property and other classes of real property it can in the process deliberately discriminate between members within the one class of single-family residential property owners. Therefore, irrespective of whether the District may constitutionally differentiate in the level of assessment applied to residential real property as opposed to commercial real property, a question which we need not and do not here decide, it clearly may not do so within the single class of residential property owners.

Affirmed.

17. Appellants' brief at 12.