**TOLU TOLU, et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 05–TX–92.

District of Columbia Court of Appeals.

Argued May 22, 2006.
Decided June 1, 2006.
Amended June 2, 2006.

Joseph A. Hennessey, for appellants.

Mary L. Wilson, Senior Assistant Attorney General, District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee.

Before SCHWELB, REID and FISHER, Associate Judges.

PER CURIAM:

In this class action, appellants challenge the District of Columbia's 2005 tax assessment of certain residential properties which contain lead contamination in pipes conveying water to their homes. They seek to invalidate the 2005 assessment. We must first determine, however, whether the District's Anti–Injunction Act, D.C.Code § 47–3307 (2001)—which provides that "[n]o suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax"—bars appellants' action.

The trial court orally granted the District's motion to dismiss the case. In response to appellants' motion for reconsideration, the trial court issued a thoughtful written memorandum and order, denying the motion for reconsideration. In that memorandum and order the court not only reviewed and focused on three of our past decisions interpreting § 47–3307, but also placed those decisions in the context of pertinent federal Anti–Injunction Act cases decided by the Supreme Court of the United States. Contrary to appellants' argument in their main brief, the trial court properly interpreted our decision in *District of Columbia v. Eastern Trans–Waste of Maryland, Inc.*, 758 A.2d 1 (D.C.2000), and properly applied the legal principles distilled from *Barry v. American Tel. & Tel. Co.*, 563 A.2d 1069, 1073 (D.C.1989), as well as from *Eastern Trans–Waste*, and *District. of Columbia v. Green*, 310 A.2d

848 (D.C.1973). Furthermore, we see no reason to disturb (1) the trial court's application of those principles to the facts found in appellants' case; or (2) its consideration of the assessment factors set forth in D.C.Code § 47–820 (Supp.2004), as well as the directive in § 47–821(c) (concerning what information the Mayor must provide to the assessors "on a timely basis"); or (3) its reference to *Firestone Tire & Rubber Co. v. County of Monterey*, 223 Cal. App.3d 382, 272 Cal.Rptr. 745 (1990), and the subsequent California decision in *Mola Dev. Corp. v. Orange County Assessment Appeals Bd. No. 2*, 80 Cal.App.4th 309, 95 Cal.Rptr.2d 546 (2000); or (4) its analysis of the irreparable injury requirement. Discerning no error, we affirm the judgment of the trial court, and incorporate the trial court's Memorandum and Order, dated February 1, 2005.

So ordered.

## ATTACHMENT

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### TAX DIVISION

**TOLU TOLU, et al.** Petitioners

v.

**MAYOR ANTHONY WILLIAMS, et al.** Respondents

### Tax Docket No. 8351–04
### *MEMORANDUM AND ORDER*

Before the Court are Petitioners Motion for Reconsideration, the opposition, and the reply.

### A. *The Standard for Determining the Petition*

Petitioners argue that the Court erred in concluding that "extraordinary circumstances" are to be determined under the

standard set forth in *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), and *Barry v. American Tel. & Tel. Co.*, 563 A.2d 1069, 1073 (D.C.1989). The Court is of the opinion that it applied the correct standard to this case, as the Court will now attempt to explain. D.C.Code § 47–3307 provides: "No suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." The petitioners do not dispute that this statute applies to the present action. The plain language of the statute admits of no exceptions. Nevertheless, our Court of Appeals, following the lead of the United States Supreme Court in interpreting a federal statute with similarly clear language [1], has created a limited exception to this absolute prohibition.

In *District of Columbia v. Green*, 310 A.2d 848 (1973), the first case in which the Court of Appeals had occasion to apply the District of Columbia statute, the court relied on *Miller v. Standard Nut Margarine Co.*, 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422 (1932), in "pointing out" that the trial court had found "the facts of this case to be so exceptional and extraordinary as to merit equitable relief." The court quoted *Standard Nut* as follows:

> [W]here complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector . . . .

310 A.2d at 852 (quoting 284 U.S. at 509, 52 S.Ct. 260). The "special and extraordinary circumstances" found by the trial court in *Green* were that the taxing authorities, deceitfully, did not inform the petitioning taxpayers that the level of their assessments had been changed until after the time by which they could have pursued an administrative remedy, thereby rendering their administrative remedy "useless." *Id.* at 852–53. *Green* thus appears to hold that the court has jurisdiction to entertain a suit for an injunction against the assessment of a tax where the assessment is both invalid and the taxpaying plaintiffs have had no administrative remedy by which to challenge the tax.

In relying on *Standard Nut* and, in addition, *Allen v. Regents of Univ. Sys.*, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938), the court in *Green* failed to mention *Williams Packing, supra*, decided after *Standard Nut*. In *Williams Packing*, the court concluded that not only must a plaintiff seeking an injunction show the inadequacy of a legal remedy, he must also show that "under no circumstances could the Government ultimately prevail." 370 U.S. at 7, 82 S.Ct. 1125. The court made clear the policy underlying this standard. The government is entitled to the prompt collection of taxes. The purpose of the anti-injunction statute is to preserve this right by prohibiting a court from interfering with the collection of taxes, requiring the determination of the legality of the tax to be determined in a refund suit. *Id.* But if it is clear that "under no circumstances" could the government prevail in a refund suit, the purposes of the anti-injunction statute would not be served by declining jurisdiction, if equity jurisdiction otherwise

1. " . . . [N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." 26 U.S.C. § 7241(a). *See also* 28 U.S.C. § 1341, containing similar language regarding injunction against the assessment or collection of state taxes.

exists. For in that instance, the "exaction is merely in 'the guise of a tax'." *Id.* (quoting *Standard Nut,* 284 U.S. at 509, 52 S.Ct. 260). The court concluded:

> We believe that the question of whether the Government has a chance of ultimately prevailing is to be determined on the basis of the information available to it at the time of suit. Only if it is then apparent that, under the most liberal view of the law and the facts, the United States cannot establish its claim, may the suit for an injunction be maintained. Otherwise, the District Court is without jurisdiction, and the complaint must be dismissed. To require more than good faith on the part of the Government would unduly interfere with a collateral objective of the Act—protection of the collector from litigation pending a suit for refund. And to permit even the maintenance of a suit in which an injunction could issue only after the taxpayer's nonliability had been conclusively established might "in every practical sense operate to suspend collection of the . . . taxes until the litigation is ended." *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 299, 63 S.Ct. 1070, 87 L.Ed. 1407 Thus, in general, the Act prohibits suits for injunctions barring the collection of federal taxes when the collecting officers have made the assessment and claim that it is valid. *Snyder v. Marks,* 109 U.S. 189, 194, 3 S.Ct. 157, 27 L.Ed. 901.

*Id.* at 7–8, 82 S.Ct. 1125.

In *Bob Jones Univ. v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), the Court comprehensively reviewed its prior interpretations of the anti-injunction statute. It pointed out that during the first half-century of the existence of the statute, "the Court gave it literal force, without regard to the character of the tax, the nature of the pre-enforcement challenge to it, or the status of the plaintiff." *Id.* at 742, 94 S.Ct. 2038 (citations omitted). Although dicta and holdings in some cases suggested that there might be extraordinary circumstances permitting a departure from a literal interpretation, the court limited those departures to special circumstances outside the pre-enforcement context. Thus, "the Court's first departure from a literal reading of the act produced a prompt correction in course." *Id.* at 743, 94 S.Ct. 2038 (citing *Graham v. Dupont,* 262 U.S. 234, 43 S.Ct. 567, 67 L.Ed. 965 (1923)).

The court in *Bob Jones* then discussed *Standard Nut* and *Allen, supra,* which followed *Standard Nut. Standard Nut,* according to the court in *Bob Jones,* set forth a "new definition of the extraordinary and exceptional circumstances test." Under the new interpretation, which virtually equated those circumstances to long-held equity doctrine, "the concept of extraordinary and exceptional circumstances was reduced to the traditional equitable requirements for the issuance of an injunction." *Id.* at 744, 94 S.Ct. 2038. *Standard Nut* was thus a "significant deviation from precedent . . .[;] it effectively repealed the Act," if read literally, and "led directly to the Court's re-examination of the requirements of the Act in *Williams Packing,* the second time the court has undertaken to rehabilitate the Act following debilitating departures from its explicit language." *Id.* at 744–45, 94 S.Ct. 2038.

*Williams Packing* switched the focus of the extraordinary and exceptional circumstances test from a showing of the degree of harm to the plaintiff absent an injunction to the requirement that it be established that the Service's action is plainly without a legal basis. The court in essence read *Standard Nut* not as an instance of irreparable injury but as a

case where the Service had no chance of success on the merits.

*Id.* at 745, 94 S.Ct. 2038.

The Court of Appeals decision in *Barry v. American Tel. & Tel. Co.,* 563 A.2d 1069 (D.C.1989), must be read against the background of the foregoing development of the law in the Supreme Court. In *Barry,* telecommunications companies challenged a gross receipts tax, and the trial court granted a preliminary injunction restraining collection of the tax. It held that "equitable relief was warranted in light of the circumstances attendant to the imposition, retroactively, of a new tax enacted as emergency legislation." 563 A.2d at 1072. It later issued a declaratory judgment holding that both the retroactive and prospective provisions of the legislation violated the Due Process Clause because of "overly burdensome costs of compliance", that the legislation violated the Commerce Clause "because [the tax] impose[d] [was] unfairly apportioned and not fairly related to the services provided in the District, and that application of the Act's provisions result[ed] in double taxation." *Id.* The trial court, relying on *Green,* found that extraordinary circumstances existed because the plaintiffs showed irreparable harm, a likelihood of success on the merits, a strong argument invoking public policy, and an inadequate remedy. *Id.* at 1075 n. 15. In denying a motion to dismiss, it found that the "novel and historic turn of events"—that is, the restructuring of the telecommunications industry and the imposition of the gross receipts tax in response to that event—constituted "sufficiently exceptional and extraordinary" circumstances. *Id.*

The Court of Appeals reversed these judgments, holding that the trial court lacked jurisdiction to entertain the suits because of the anti-injunction provisions of D.C.Code § 47–3307 (1987). It held that

[a]lthough the language in *Green* guided the decision below, ... the proper standard for determining whether equitable relief may be obtained against the collection of any tax requires: (*l*) a finding that "under no circumstances could the Government ultimately prevail," and (2) that "equity jurisdiction otherwise exists," that is, proof of irreparable injury and inadequacy of the legal remedy.

*Barry,* 563 A.2d at 1075 (quoting, *Williams Packing,* 370 U.S. 1, 6–7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (citations omitted)). In so holding, the court refused to follow *Green* and the case on which it relied, *Standard Nut.* The court observed that *Green* itself noted that the " 'jurisdictional points [were] not pressed with vigor ..., each of the parties preferring a decision on the merits,' " and that it " 'simply point[ed] out' that it accepted the trial court's finding of 'exceptional and extraordinary circumstances.' " The court in *Barry* therefore "[did] not deem the *Green* court's reference to *Standard Nut* to have enunciated a substantive [standard] to be followed thereafter in determining jurisdiction over cases involving injunction against the collection of taxes." *Id.* (footnote omitted).

It is clear that *Barry* brought the law in the jurisdiction exactly into line with the law established by the Supreme Court. As the Supreme Court in *Williams Packing* "unequivocally gutted the 'special and extraordinary circumstances' exception created in *Standard Nut,*" *Barry,* 563 A.2d at 1076, so the court in *Barry* limited *Green* to the "compelling equities of that particular case." *Id.* at 1075. The law in this jurisdiction, as in federal jurisdiction, is that the taxpayer, in addition to meeting well established criteria for invoking equity power, must "prove that the government has no chance of success on the

merits." *Id.* at 1076. Under *Barry,* therefore, the anti-injunction statute is given "almost literal effect." *Id.*

Petitioners argue that the court in *District of Columbia v. Eastern Trans–Waste of Maryland, Inc.,* 758 A.2d 1 (D.C.2000) "rejects the *Williams Packing & Navigation Co./Barry* as the exclusive test for determining the existence of 'extraordinary circumstances.'" If that is the case, the court, in this Court's opinion, has returned the law to the sort of "debilitating departures" from the explicit language of the anti-injunction statute that the Supreme Court disapproved in *Bob Jones.* But this Court does not believe that the court in *Eastern Trans–Waste* did reject the *Barry* standard.

In *Eastern Trans–Waste,* the District imposed a permit requirement, and fees, on waste collection businesses that collected waste in the District of Columbia. One of those businesses filed suit seeking an injunction against enforcement of the legislation, including collection of the fees it required. The trial court granted a temporary restraining order and later granted partial summary judgment in favor of the plaintiff. The pertinent part of its holding was that a fee imposed on solid waste facilities violated the Commerce Clause insofar as it applied to waste originating in and destined for disposal outside the District, if it was processed in the District for less than 24 hours. *See* 758 A.2d at 7. The trial court did not address the anti-injunction statute because the District did not raise it.

On appeal, the District argued, in its responsive and reply brief, that the Court lacked jurisdiction because of the anti-injunction statute. In addressing this argument, the Court of Appeals began as follows:

... [T]wo inquiries are necessary (*l*) Do the exceptions to the bar against jurisdiction under § 47–3307 apply in this case? (2) Has the District waive(d) the anti-injunction statute by not raising it prior to the filing of its responsive and reply brief.

*Id.* at 12–13. The "exceptions", it said, are:

"1) a finding that 'under no circumstances could the Government ultimately prevail,' and 2) that 'equity jurisdiction otherwise exists,' that is, proof of irreparable injury and inadequacy of the legal remedy."

*Id.* at 13, quoting *Barry* and *Williams Packing.* It later noted that in *Barry* "we laid down the rightly stringent standard quoted above for invocation of equitable relief." *Id.* at 14 n. 22.

Given the foregoing comments, there is no doubt that the standards established in *Barry* continue to govern the issue of whether or not a court has jurisdiction to entertain a suit to enjoin the assessment or collection of taxes (or, for that matter, to issue a declaratory judgment that an assessment or collection is illegal). The issue on which *Eastern Trans–Waste* turned was not whether the plaintiff had satisfied those standards; the court explicitly held that it had not when it said that "we are unable to say that 'under no circumstances could the Government ultimately prevail.'" *Id.* at 13. The issue rather was whether the District could waive application of the anti-injunction statute. (It clearly had done so by not raising the issue until its responsive and reply brief in the Court of Appeals.) The Court made this clear when, after concluding that one of the two necessary prongs of the *Williams Packing* test had not been met, it "turn[ed] ... to [its] second inquiry: Has the District, or could it, effectively waive[d] the anti-injunction statute by not raising it prior to the filing of its responsive and reply brief?" *Id.* at 13.

In its ensuing discussion, the Court, noting its own as well as federal cases, stated that "this court has never explicitly held that § 47–3307 is not subject to waiver or estopppel." *Id.* (footnote omitted). It distinguished *Barry,* observing that while it correctly laid down a "stringent standard," it did not "otherwise absolutely bar[ ] the door to any consideration whatever of waiver or estoppel, should the court be faced with uniquely " 'exceptional and stringent' " circumstances." *Id.* at 14 n. 22. It then went on to find "extraordinary and stringent, indeed unique circumstances", not present in *Barry,* compelling it to find that the District could waive the application of the statute. Those circumstances are discussed at page 14 of the opinion, and need not be detailed here. The court said:

> We emphasize that it is the combination of circumstances, not any individual aspect, that is controlling. For example, the District is not empowered to "waive" the statute in any normal sense of that word, and a trial or appellate court has the right to raise the statutory bar sua sponte. Here, however, we have a complete failure by the District, the very entity whose fiscal operations the statute is intended to protect, to raise the issue for an extraordinary extended period of time and even then only by way of a reply brief in an appellate court. Similarly, the fact that the trial court has neared a judgment on the substantive merits would not itself be sufficient, any more than it was in the cited case. The anti-injunction statute is subject to strict construction and, and only the rarest combined circumstances can warrant its equitable override.

*Id.* at 13–14 n. 24.

The foregoing makes plain that only in the context of considering whether the jurisdictional issue could be waived did the Court feel it necessary to address and determine whether "extraordinary and stringent, indeed unique circumstances" existed. Those circumstances, plus the Court's finding that the trial court had not abused its discretion in finding in favor of the plaintiff on the standard preliminary injunction factors, see *id.* at 14–18, enabled the court to find that the District had waived the jurisdictional point. *Id.* at 14. ("[U]nless we determine that the trial court abused its discretion in modifying and extending the July 7, 1995 temporary restraining order against the District, the equitable approach is to conclude, on the extraordinary, stringent, and unique circumstances presented to us . . . that § 47–3307 does not constitute an absolute bar to our jurisdiction.").

Petitioners argue that *Eastern Trans–Waste,* though addressing the waiver issue, relied not on waiver, but on " 'the equitable approach' " used in the last quoted portion of the opinion. This Court cannot agree. If an "equitable approach," untied to the waiver issue, was sufficient to sustain jurisdiction, there was no need to have addressed it at all. Plainly, however, the waiver issue was one of two issues the Court needed to address to come to a decision. That, *Barry* continues to be the test is evident from *Agbaraji v. Aldridge,* 836 A.2d 567, 569 (D.C.2003), where the Court reiterated the *Barry* test, citing both *Barry* and *Eastern Trans–Waste.*

Petitioners argue that the application of the *Barry/Williams Packing* test prevents the Court from doing "substantial justice in this case," pointing out that "equity knows of no hard and fast rules." Adopting petitioners' argument, however, would lead the Court down the path that the Supreme Court rejected in *Williams Packing* and our Court of Appeals rejected in

*Barry*—a case-by-case weighing of equities in an attempt to do "substantial justice." Petitioners point out the "extraordinary circumstances" that they contend exist in this case: the massive lead contamination; the failure of the District to incorporate the information into its assessments; and the District's profiting from its failure to make public the information regarding lead contamination that it had learned from The District of Columbia Water and Sewer Authority until after the assessment measurement date. These might be deemed "extraordinary circumstances" under petitioners' reading of the law; in another case there might be other "unique" facts or combinations of facts that might lead a court to deem the circumstances "extraordinary." Untied to any fixed standard, petitioners' argument would lead to burdensome litigation and uncertainty in the application of the law, undermining the ability of the government to collect taxes.[2] It must be recalled that the Court's analysis starts with a statute that by its plain terms prevents the Court from exercising jurisdiction at all. Petitioners would have the Court, despite this statute, address the merits of a taxpayers' petition, weigh the equities, and come to an equitable decision, all in an effort to determine whether the Court has jurisdiction in the first place. This approach is inconsistent with the anti-injunction statute.

### B. *Application of the Standards*

### 1. *Does the District Have No Chance to Prevail in a Tax Refund Appeal?*

In considering the first part of the *Barry* test, the Court necessarily must consider the merits of the issue of whether an assessment on petitioners' property must take into account evidence of lead in the pipes providing water to that property. Nevertheless, it is not the Court's job to make a decision on those merits. *Barry*, 563 A.2d at 1076. Rather, it must decide whether or not petitioners' legal argument is " 'sufficiently debatable to foreclose any notion' that under no circumstances could the District ultimately prevail." *Id.* at 1076 (quoting *Bob Jones, supra*, 416 U.S. at 749, 94 S.Ct. 2038).

Petitioners argue that the assessment must take into account the impact of lead contamination on the estimated market value of their properties. They are correct in citing D.C.Code § 47-820(a)(3)(2004 pocket part) for the proposition that the Mayor "shall take into account any factor that may have a bearing on the market value of the real property." As the Court indicated at the hearing, the Court does not rule out the possibility that lead contamination is required to be considered by the assessor, even if there is no "market data" that would show its impact on market value. *See, e.g., Boekeloo v. Bd. of Review*, 529 N.W.2d 275, 278 (Iowa 1995), and cases cited there. But, also as indicated at the hearing, the assessed value of property is its estimated market value as of the "valuation date." *Id.* The "valuation date" is January 1, of the preceding real property tax year. At any hearing on a tax refund suit, the question would be whether lead contamination in the pipes carrying water serving any of the petitioners' properties was a factor that should have been used in the assessment of the estimated market value of those properties as of January 1, 2004.

In rendering its judgment, the Court relied on the fact that the "market" did not

---

2. One of the purposes of the federal anti-injunction statute is "protection of the collector from litigation pending a suit for refund."

*Williams Packing*, 370 U.S. at 8, 82 S.Ct. 1125.

know of the possibility of lead contamination in owners' properties until the Washington Post article in late January, 2004. Petitioners correct the Court to the extent that the Court may have relied on the premise that market value is determined by what any particular owner, or buyer, actually knew about whether lead contamination existed. They cite the well established rule that the "willing buyer-willing seller test is an objective one requiring that potential transactions be analyzed from the viewpoint of hypothetical buyers and sellers." (Pet'rs Mem. Supp. Mot. Recons. at 6). In the Court's opinion, this proposition does not solve the issue of what information the assessor should use in making the assessment.

Petitioners say: "Hypothetical buyers and sellers must be deemed to know about the widespread lead-contamination of residential [properties] because this was a knowable fact on January 1, 2004." (Pet'rs Mem. Supp. Mot. Recons. at 7). They cite in support of their argument United States Treasury Regulations stating that "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case." *Id.* Assuming for purposes of argument that the language in these regulations applies to assessments, the Court remains unconvinced that there is "no doubt" that "all relevant facts" must be considered if "knowable," whatever the circumstances.

One example might suffice to illustrate the Court's hesitance to fully embrace petitioners' argument. We might posit a piece of property with oil under it, deep underground. That oil would affect the value of the property. Discovering its existence, however, would require extensive and expensive geological surveys, and perhaps even drilling. The oil exists as of the valuation date, and its existence certainly is "knowable" in the sense that, with the expenditure of large sums of money, it can be discovered. Is the existence of the oil, then, a fact that the assessor must take into account? If the assessor learns that there might be oil underneath the property, must he investigate to determine whether there *is* oil? Must he assume that there is oil without investigation?

The problem in the present case is akin to the one posited, though of course presenting a more accessible hidden condition. The petitioners have represented that "[i]n October 2002, city officials were notified by the Washington Area Sewer Authority ("WASA") that residential water supplies had tested above the Environmental Protection Agency's 'action' level for lead contamination." (Pet'rs Statement of Undisputed Material Facts Opp'n to the Mayor's Mot. Summ. J., ¶ 3). They represent that "[i]n the summer of 2003, over 6,000 homes were tested for lead in their water supplies. Over 4,000 of these homes tested above the EPA action level for lead. In response to these test results, the City did nothing." (*Id.*, ¶ 4.) They represent that "[t]he fact that significant numbers of residential properties that were tested by WASA had water that exceeded the EPA action limit of 15 parts per billion was a fact known to the Mayor in 2003." (First Am. Compl. ¶ 25). Further they represent that "WASA reported in its 2003 Drinking Water Quality Report that 'the sample tests of tap water from 26 District of Columbia homes showed elevated lead concentrations in 2002....'" (Ex. 7.) Assuming that the District (as opposed to WASA) did know any or all of this information, the information did not tell the District that any of the petitioners' properties had lead levels exceeding EPA limits.[3]

3. The Court has assumed these facts for pur-    poses of argument, but points out that none of

It suggested that these properties *might* have contamination, but, because the lead was hidden, whether or not there was contamination of any of petitioners' properties could not have been ascertained unless there was testing. (Ex. 7 at unnumbered sixth page.)

D.C.Code § 47–820(a)(3) (2004 pocket part) provides that "[a]ssessments shall be based upon the sources of information available to the Mayor, which may include actual viewing." Was there a source of information "available to the Mayor" indicating that any of the petitioners' properties contained pipes contaminated by lead? The petitioners would have a stronger position if there were some proof, available as of January 1, 2004, that their pipes were contaminated. In *Boekeloo, supra,* for example, the assessor was held to be on notice of the contamination, even though he was unaware of it. 529 N.W.2d at 276–78. In that case, however, a bank had already had prepared an assessment that revealed the contamination. Id. at 276. In several other cases in which the courts have deemed environmental contamination relevant in determining market value, the fact of contamination was either known, or the issue presented in the present case was not raised. *See, e.g., Reliable Electronic Finishing Co., Inc. v. Board of Assessors of Canton,* 410 Mass. 381, 573 N.E.2d 959 (1991) (contamination known as of tax assessment date); *In re Appeal of B.P. Oil Company, Inc.,* 159 Pa.Cmwlth. 414, 633 A.2d 1241 (1993) (unclear whether assessor, or anyone, knew of contamination; issue not raised); *Monroe County Board of Assessment Appeals v. Miller,* 131 Pa.Cmwlth. 538, 570 A.2d 1386, 1390 (1990) (taxpayer's expert testified that the

"known benzene contamination ... rendered [the taxpayers' lots] unmarketable"); *In the Matter of Commerce Holding Corp. v. Board of Assessors,* 216 A.D.2d 466, 628 N.Y.S.2d 186 (1995) (assessment dates came after site designated a Superfund site because of contamination); *Garvey Elevators, Inc. v. Adams County Bd. of Equalization,* 261 Neb. 130, 621 N.W.2d 518, 521–523 (2001) (environmental assessment showing contamination done before tax assessment years showed). In *Cunningham v. Town of Tieton,* 60 Wash.2d 434, 374 P.2d 375, 377, 380 and n. 7 (1962), on which petitioners rely, the issue was not whether a hypothetical buyer would know of contamination, but whether he or she would be affected by it. Property owners knew of the contamination because of odors and, the Court pointed out, were under a duty to inform buyers of the concealed defect.

On the other hand, in the one case found by the Court or by the parties in which the issue of knowledge of a hidden defect was presented, the Court concluded that an unknown defect should not have been considered in making the assessment. *Firestone Tire & Rubber Company v. County of Monterey,* 223 Cal.App.3d 382, 272 Cal. Rptr. 745 (1990). The court in that case considered two distinct issues. One issue, presented on appeal by Firestone, was whether the assessor should have considered the fact that, after the valuation date, the company decided to close the plant, thus changing the use of the site. That issue is not relevant here. The second issue, raised on cross appeal by the county, was whether the trial court correctly decided that "the cost of cleaning up pollution at the plant reduced its fair market value," and therefore the assessor should

---

these assertions are supported by evidence in the form of affidavit or other evidentiary material. The WASA report, Exhibit 7, is in

evidence, but it does not say that WASA informed the District of the information.

have determined that cost in making the assessment. *Id.* at 390, 272 Cal.Rptr. 745. The determination of that issue is relevant in this case.

Although the pollution existed before the valuation date, it was undisputed in *Firestone* that "the county assessor's office did not know of the pollution on the assessment date, March 1, 1980." *Id.* at 386, 272 Cal.Rptr. 745. Firestone made an offer of proof, accepted by the trial court, that "a knowledgeable buyer would have inspected the property for toxic pollution." *Id.* at 391, 272 Cal.Rptr. 745. But, while Firestone argued that there was evidence of pollution as of the valuation date, the Court of Appeals stated that "[t]here was no evidence presented to the board that the contamination had come to light on the 1980 lien date...." *Id.* at 395, 272 Cal. Rptr. 745. The Court of Appeals concluded:

> We ... find the weight of the evidence supports the conclusion that as of March 1, 1980, a potential purchaser would not have been aware of the contamination.... In addition, ... we find unpersuasive [Firestone's] implied position that an assessor should be held to knowledge obtained after the fact.... [T]hat contamination was discovered at the plant after operations ceased does not persuade us that whatever reduction in the plant's fair market value was caused thereby would provide the basis for reevaluating the property for tax purposes for 1980.

*Id.* The court therefore reversed the trial court's judgment that remanded the case for "an appropriate reduction in valuation to reflect the cost of toxic cleanup." *Id.* at 396, 272 Cal.Rptr. 745.

The petitioners appear to argue that the Court of Appeals' conclusion cited above was not necessary to its decision, stating that the case was ultimately resolved on other grounds, by resolution of an issue that is not relevant to the present case. (Pet'rs Mem. Supp. Pet'rs Mot. Recons. at 9). This Court disagrees. The California Court of Appeals made two judgments: it upheld the appeals' board's valuation based on the premise that the company, on the valuation date, was in fact operating, and it reversed the court's remand for a *reduction* in that valuation based on the costs of toxic cleanup. The conclusion that assessor should not be charged with knowledge of the contamination was essential to the second judgment. This is made clear in *Mola Dev. Corp. v. Orange County Assessment Appeals Board No. 2*, 80 Cal. App.4th 309, 95 Cal.Rptr.2d 546 (2000), where the court said, in describing the holding in *Firestone:*

> ... [I]ts actual holding is a rather prosaic one: The taxpayer did not show that the need to clean up the property existed as of the lien date. The key language as far as the actual holding case is found on page 395 of the opinion: "[A]s of March 1, 1980, a potential purchaser would not have been aware of the contamination, the full extent of which, after its initial discovery in 1981, may not have been revealed until a few months before the April 1984 board meeting, and indeed, until much later still." Accordingly, the appellate court held that it was error for the trial court, as it had, to remand the assessment back to the appeals board for a reduction based on the "valuation for the 1980" tax year.

*Id.* at 552. Indeed, the Court of Appeals in *Firestone* actually expressed its holding a little differently. It stated:

> The salient issue is ... whether the assessor should have valued the Firestone's property for tax purposes in 1980 as a polluted property. On this issue,

we conclude insufficient evidence supports Firestone's position that the assessor knew, or should have known, that its plant was contaminated on March 1, 1980.

223 Cal.App.3d at 394, 272 Cal.Rptr. 745.

This Court therefore is of the opinion that the *Firestone* decision does stand for the proposition that a hidden defect, not known to the parties or to the assessor, cannot be used in the assessment unless, at a minimum, the assessor "should have known" of the defect as of the valuation date. Petitioners contend that, even under this standard, the assessors were on constructive notice of the defect because the Mayor was required to inform them "about the potential for damage to property consequent to the massive lead contamination." They cite D.C.Code § 47–821(c), which provides:

> The Mayor shall assure that information regarding the characteristics of real property, sales and exchanges of all such property, building permits, land use plans, and any other information pertinent to the assessment process shall be made available to the assessors on a timely basis.

The Court will assume for purposes of argument that, under this statute, the Mayor was required to inform the assessors of the information he received from WASA telling him that "that residential water supplies had tested above the Environmental Protection Agency's 'action' level for lead contamination" and that tests at some 26 residences had detected lead beyond acceptable levels. Even if the Mayor had so informed the assessors, this information, on the facts of this case, would not have told them that any of petitioners' properties had excessive levels. If the test is whether the assessors "should have known" of lead contamination in any of the pipes involved in petitioners' properties, in order to hold in petitioners' favor, a court would need to conclude that they were obliged to cause investigations to be made to determine that excessive lead did in fact exist.

The Court is inclined to view the test as whether, after reasonable investigation given the sources "available" to the assessor, the assessor should be charged with knowledge. But the Court need not resolve that issue in making its decision here. The Court need only decide whether the petitioners have shown that "under no circumstances" could the District prevail in a tax refund suit. *Barry*, 563 A.2d at 1076. It is possible that in such a suit a court might find that the assessors, given the information about lead levels that had been provided by WASA, would be charged with determining whether excessive lead existed such that the lead levels in any or all of petitioners' properties should have been used in determining valuation. But the Court, having in mind "the most liberal view of the law and the facts," *Williams Packing*, 370 U.S. at 7, 82 S.Ct. 1125, cannot reach that conclusion in this case.

### 2. Is there Proof of Irreparable Injury and Inadequate Legal Remedy?

Petitioners must also prove "irreparable injury and inadequacy of legal remedy." *Barry*, 563 A.2d at 1075. Petitioners do not contend that they are not afforded a legal remedy; the law provides them one. This remedy includes review at the administrative level, D.C.Code § 47–825.01(f-1), in the Superior Court, D.C.Code §§ 47–825.01(j-1), 47–3303, and in the Court of Appeals, D.C.Code § 47–3304.[4] Rather,

---

4. This case is thus unlike *South Carolina v. Regan*, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984), where Congress had provided no alternative remedy to the petitioner.

petitioners argue that "[a]n administrative process at which hearing officers are acting illegally, arbitrarily and capriciously is not an adequate remedy." They cite various examples of assessors failing to receive evidence, "bar[r]ing, categorically, the introduction of any evidence of lead contamination or lead water pipes as a ground for appealing some property assessments," and then, in one instance, reducing an assessment based on lead contamination "notwithstanding the fact that [the taxpayer] presented no direct evidence of lead water pipes or lead contamination." (Emphasis in the original.)

Contrary to the petitioners' perceptions of the Court's ruling, the Court did not mean to state or imply that it condoned arbitrary administrative action. The Court's point was, and is, that such action does not mean that an adequate legal remedy is unavailable. If the administrative agency acts arbitrarily in a tax refund suit, the courts are available on appeal to correct the unlawful action. This availability affords the petitioners an adequate remedy. If a taxpayer has a " 'full opportunity to litigate [his or her] tax liability in a refund suit,' " the taxpayer has an adequate legal remedy. *United States v. American Friends Serv. Comm.*, 419 U.S. 7, 11, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974) (quoting *Alexander, Com'r of Internal Revenue v. 'Americans United' Inc.*, 416 U.S. 752, 762, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974)).

C. *CONCLUSION*

The petitioners have satisfied neither part of the *Barry* test, and they must satisfy both to establish jurisdiction.

In *Regan,* the Supreme Court held that where no alternative remedy was provided, the petitioner need not meet the first prong of the

Accordingly, the Court **ORDERS** that the Motion for Reconsideration is **DENIED.**

SIGNED IN CHAMBERS

/s/ A. Franklin Burgess, Jr.
Judge

**January 31, 2005**

*Williams Packing* test. *Id.* at 378, 104 S.Ct. 1107.